**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROWN SPECIALTY COMPANY, Respondent.**

**No. 18278.**

United States Court of Appeals, Seventh Circuit.

Jan. 8, 1971.

Rehearing Denied Feb. 22, 1971.

---

Marcel Mallet Prevost, Asst. General Counsel, Corina Metcalf, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Abigail · Cooley Baskir, Angelo V. Arcadipane, Attys., N.L.R.B., for petitioner.

Burrel Barash, Barash & Stoerzbach, Galesburg, Ill., for Brown Specialty Co.

Before DUFFY, Senior Circuit Judge, FAIRCHILD and PELL, Circuit Judges.

DUFFY, Senior Circuit Judge.

The Labor Board petitions for enforcement of its order and its supplemental order issued on February 14, 1969 and January 27, 1970, respectively, against Brown Specialty Company (Company). The Board's decision and order and its supplementary decision and order are reported at 174 N.L.R.B. No. 77 and 180 N.L.R.B. No. 149, respectively.

The Board found the Company violated Section 8(a) (1) of the Act in opposing the organizational drive of the Union,[1] by systematically and coercively interrogating its employees concerning their union membership and activities; creating the impression of surveillance; soliciting employees to withdraw union authorization cards; threatening to make working conditions more onerous; threatening to eliminate employees if the union succeeded in organizing the plant; and warning employees that they were jeopardizing their jobs by signing union cards.

The Board also found the Company violated Section 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the union as the designated bargaining representative of a majority of its employees in a concededly appropriate unit.

The Board ordered the Company to cease and desist from all unfair labor practices found, and further issued a bargaining order directing the Company to bargain with the union as the lawfully designated representative of a majority of the employees in an appropriate unit.

On February 3, 1968, Walter Bruner, President of the union, addressed a meeting of five of the Company's fourteen office and clerical employees, which was held at the home of employee Michele Swanson. Bruner explained that by the signing of a union application card, the employees were designating the union as their exclusive collective-bargaining representative. He also stated that

1. Local 221 of the Office and Professional Employees International Union, AFL–CIO.

should the Company deny recognition, one of the purposes of the cards was to secure an election.

Thereafter, employee Michele Swanson solicited and obtained five additional signed authorization cards from her fellow employees. There was testimony that in each case, the representation was made that the employees would have an election.

On February 12, 1968, Bruner sent a letter to Company President Golofsky asserting that the union possessed signed cards from a majority of the Company's employees in the appropriate unit and requested a date for a meeting to negotiate a contract. The Company made no response to this demand and the union filed a petition for an election on February 19th. The union claims that management responded with an anti-union campaign.

Several days after receiving the union demand for recognition, Supervisor Olson asked employee Martha Dahl whether she was in favor of the union. On February 19, Olson asked employee Rossie Sargeant if she knew anything about the union activities and why she wanted a union. She told Olson she wanted better wages and he then told her if the union prevailed "things would be different."

Also, on February 19, Olson asked employee Linda Jackson if she had signed a union card and if she knew about a meeting that was held to sign cards. Olson told her that President Golofsky would shortly summon the employees to his office and ask them to give reasons for signing the union cards. Olson stated that by going behind the President's back in an underhanded and backward manner, the employees were forcing the President to take "drastic measures", and that the President could eliminate all the employees and still conduct the business. Later, on February 19, Olson told employee Jackson he knew who started the "union business" and where the meeting was held. He also recommended that "things were definite-

ly going to get rougher if the union went through."

On February 20, President Golofsky call Fred Newman, the father of employee Susan Newman, asking him to talk to his daughter about getting back her union authorization card.

The next day, President Golofsky asked employees Virginia Fall and Marion Witherbee whether they had signed union cards. When neither responded to his question, he told them that if the union came in, he would discontinue his present lenient practices and dock them if they were absent or late. On the same day, he told Michele Swanson that he did not like the union and would fight it. He solicited her to write a letter to the union requesting the return of her authorization card.

Later, on the same day, Golofsky told employee Rossie Sargeant that he did not want the union and that he "would do anything to keep from getting it." Also, after he had obtained Sargeant's answer that she signed a card, Golofsky informed her that he was having Jo Thomas prepare a letter requesting the withdrawal of union cards and that he wanted her (Sargeant) to sign it.

Jo Thomas did draw up a letter requesting the return of authorization cards. Thomas convinced all ten employees who had signed cards that they should sign the withdrawal letter.

In convincing Michele Swanson to sign the withdrawal letter, Thomas told her it was drafted at Golofsky's request and that it would be "pretty rough" for the employees if they did not sign.

Several days later, Olson again spoke to employee Riner telling him that if the union prevailed things "would definitely change for the worse * * *" and that Riner was "jeopardizing his job by signing a union card."

■ The Company vigorously denies that Olson was a supervisor, asserting that he was merely a management trainee. However, Section 2(11) of the Act defines the term "supervisor," and lists those powers which might make an indi-

vidual a "supervisor." Possession of any one of the enumerated powers establishes supervisory status. N. L. R. B. v. Elliott-Williams Co., 345 F.2d 460, 463 (CA 7, 1965).

 The evidence before the Board and the stipulated facts show that Olson worked closely with management. He had no regular working hours; he was the only person in his department who was on a straight salary. Also, new hirees reported directly to Olson and he introduced them to the other employees. Furthermore, his supervisory status is shown by the fact that he exercised his judgment in assigning work to employees and, at times, recommended the hiring or rehiring of employees. The record discloses one occasion when he discharged an employee. In our view, the Board did not abuse its discretion in finding that Olson was a supervisor. N. L. R. B. v. Koplin Bros. Co., 379 F.2d 488, 490 (CA 7, 1967).

The evidence is also clear that shortly after President Golofsky received the union's request for recognition, he told several employees that he would initiate procedures for their withdrawal from the union, and that thereafter he personally and through his agents, solicited revocation of the authorizations previously given.

We hold there is ample evidence to support the Board's findings that the Company violated Section 8(a) (1) of the Act by soliciting employees to withdraw their union authorizations.

The only close question in this case is the propriety of the order for bargaining. There was here no history of anti-unionism by the Company. For years, the warehouse employees and the drivers had been represented by the Teamsters Union.

Nevertheless, we agree with the Board that the Company's activities in opposing this particular unionization campaign constituted a "calculated effort to undermine the Union's majority status and prevent the holding of an election" and were "so flagrant and coercive in nature as to require \* \* \* a bargaining order to repair their effect." N. L. R. B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The Company argues that a number of the employees who signed cards have, since that time, for reasons of their own, left the Company's employment. However, in N. L. R. B. v. Gissel Packing Company, *supra*, the Supreme Court reaffirmed the principle that a bargaining order is not rendered inappropriate by the circumstances that a union had lost or may have lost its majority status. The Supreme Court stated in 395 U.S. at page 612, 89 S.Ct. at page 1939: "Such an argument ignores that a bargaining order is designed as much to remedy past election damage as it is to deter future misconduct."

The order of the Board will be enforced.