NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ADAM & EVE COSMETICS, INC., Respondent.

No. 76–1479.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1977.

Decided Dec. 12, 1977.

Elliott Moore, Deputy Associate Gen. Counsel, Howard Fine, Robert G. Sewell, Attys., N.L.R.B., Washington, D.C., for petitioner.

Henry C. Ryder, Indianapolis, Ind., for respondent.

Before BAUER and WOOD, Circuit Judges, and FOREMAN, District Judge.*

* The Hon. James L. Foreman, United States District Court for the Eastern District of Illinois, is sitting by designation.

BAUER, Circuit Judge.

The Board here applies for enforcement of its order directing the respondent company to offer reinstatement to an ex-employee and to cease and desist from engaging in unfair labor practices found violative of the National Labor Relations Act. In its final decision accompanying its order, the Board, Member Kennedy dissenting, found that the company had violated Sections 8(a)(1) and (3) of the Act by coercively interrogating an employee about his union activities, by threatening the same employee that the company would shut down its plant in the event of unionization, and by discharging him allegedly because of his pro-union sympathies. Additionally, the Board, Member Kennedy again dissenting, found that the company had violated Section 8(a)(1) of the Act by unlawfully promising its employees certain benefits to induce them to vote against unionization. We find Member Kennedy's dissent to the Board's decision persuasive and deny enforcement of its order for the reasons noted below.

I.

The result in this case turns principally on the issue of whether Oscar Schwartz was an employee of the respondent within the meaning of Section 2(3) of the Act or a supervisor within the meaning of Section 2(11). If Schwartz was a supervisor, the company could not have violated Section 8(a)(1) by coercively interrogating him and threatening him that it would close its plant if he succeeded in organizing its employees. Nor could the company have violated Section 8(a)(3) by discharging him allegedly for his pro-union activities. We thus turn our attention to a review of the evidence supporting the Board's finding that Schwartz was an employee rather than a supervisor.

Respondent operates a small factory in which it manufactures boxes and windshield washer solvents. The plant consists of a production line, a warehouse and an office, in which 10 to 12 employees worked during the relevant period. At the time of the hearing held by the administrative law judge, the plant had been in operation about a year. Serious production problems frequently had occurred due to persistent difficulties in obtaining sufficient quantities of methanol, an essential ingredient of the company's product. Accordingly, the company's employees were periodically laid off, and turnover among both supervisory and nonsupervisory personnel was high.

Oscar Schwartz was hired in September 1973 as a truck loader at $1.90 an hour. In March of 1974 he was promoted to the position of production line supervisor and placed in charge of the 7 to 8 employees working on the assembly line. In that supervisory capacity Schwartz initially received $2.10 an hour. By June his wage had been increased to $2.50 an hour. Like the plant manager Russell Roush, who supervised the warehouse, Schwartz received overtime pay and engaged in manual labor alongside his fellow employees. As a supervisor, however, Schwartz was assured of being paid on days when other production personnel were sent home because of a shortage of methanol.

Near the end of July, the company's president, Charles Clark, expressed dissatisfaction with Schwartz's performance as production supervisor and told him that he would be fired. Schwartz pleaded to be transferred back to the warehouse rather than fired. Clark said he would consider doing so, and he then began advertising for a production line supervisor to replace Schwartz. In early August, Clark hired Danny Smith to replace Roush as plant manager and Schwartz as production line supervisor. When Smith reported for work on August 14th, Schwartz was put in charge of the warehouse. Roush remained on the payroll for a few days, during which time he trained Smith in his duties as plant manager and production supervisor.

After his transfer to the warehouse, Schwartz handled the company's shipping and receiving, was involved in inventory control and directed the one to four other employees periodically assigned to the warehouse. Schwartz, however, retained responsibility for setting up the production line and mixing the ingredients that went

into the company's product. He received the same salary he had as production supervisor and continued to be paid on the days the production line was shut down for lack of methanol. Schwartz's supervision of the other warehouse employees, according to his own testimony, consisted of the following:

"[I]f they were back there with me, a truck came in to be loaded, I would tell them who I wanted up in the truck, from there we would figure out what we was going to move into the truck. If there wasn't no truck there, just working in the warehouse, moving stuff, I would instruct them as to what I wanted moved and how I wanted it placed back, the spot where we was moving it to."

Schwartz estimated that he spent about 50% of his time in physical labor and the rest of the time he would

"instruct the boys what I wanted them to do, and I would just walk back and forth between the two spots to make sure they went into the spots where we wanted it. Where it was to go."

The administrative law judge found on the basis of the above facts that Schwartz was not the warehouse supervisor but a team leader who exercised no independent judgment in directing the loading of trucks and the moving of finished products about the warehouse. In so finding, the administrative law judge was influenced by the fact that, if Schwartz were to be found a supervisor, there would be two supervisors for a work force that never reached more than 12 and that was often no greater than 4 due to periodic layoffs of assembly line workers.

The Board, adopting the administrative law judge's findings, deemed significant the menial nature of the tasks performed by Schwartz and his coworkers. According to the Board, Schwartz's direction of his fellow employees, involving as it did only routine warehouse work, could not have required the exercise of independent judgment. Says the Board, Schwartz's supervision consisted solely of advising his fellow coworkers to assist in what he was told by shipping orders or knew from experience had to be done. It was in the role of an experienced senior employee, and not that of a supervisor, that Schwartz gave routine instructions to his coworkers, according to the Board. Similarly, it was the fact that Schwartz was a skilled senior employee that explains why he received no diminution in pay when he was demoted from production supervisor to general warehouseman.

Member Kennedy dissented from the Board's decision. He found significant the fact that, at the time Schwartz was transferred to the warehouse, Clark told Schwartz that he would be "in charge" of the warehouse and subsequently reprimanded him for not keeping the warehousemen busy. Moreover, Kennedy noted that Schwartz received no diminution in pay and continued to be paid even though subordinates were laid off because of methanol shortages—a significant perquisite of his supervisory status. Most important, Kennedy believed that Schwartz's own testimony revealed that he had the authority to responsibly direct the warehouse employees in the course of their duties. As the company had always had two supervisors prior to Smith's arrival as plant manager, Kennedy did not find any incongruity in the fact that the ratio of employees to supervisors would be unusually low if Schwartz were to be deemed a supervisor. The evidence, as Member Kennedy viewed it, pointed to the conclusion that Schwartz had been laterally transferred from production supervisor to warehouse supervisor, and not demoted to the status of a rank and file employee.

With the above facts in mind, we turn to the question of whether the Board's finding regarding Schwartz's nonsupervisory status has sufficient support in the record.

## II.

■ We recognize that the Board is entitled to a "large measure of informed discretion" in determining whether an individual is a "supervisor" within the meaning of Section 2(11) of the Act. *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct.

103, 54 L.Ed.2d 85 (1977). As the issue is primarily one of fact, the Board's determination regarding the supervisory status of an employee will not be overturned as long as substantial evidence exists to support the Board's finding. *NLRB v. Ertel Mfg. Corp.*, 352 F.2d 916, 918 (7th Cir. 1965), *cert. denied*, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966).

In applying the "substantial evidence" test, however, we are not empowered to rubber-stamp the Board's decision simply because the supporting evidence may be "substantial" when considered by itself and in isolation from the evidence that fairly detracts from the Board's conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Rather, we must take into account the entire record, including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn. *Id.* at 487–88, 71 S.Ct. 456. If, when so viewed in its entirety, the record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion," we must accept the Board's findings. *Id.* at 477, 71 S.Ct. 456. On the other hand, if the record as a whole "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence," we must set aside the Board's findings. *Id.* at 490, 71 S.Ct. at 466.

Viewed in the light of the above standard of review, the record as a whole convinces us that we must set aside the Board's order, for we do not find the evidence supportive of the Board's finding that Oscar Schwartz was an employee rather than a supervisor to be substantial when it is considered alongside the evidence that fairly detracts from the Board's conclusion.

Section 2(11) of the National Labor Relations Act provides:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

The parties agree that possession of any one of the above indicia of supervisory status will suffice to render an employee a statutory "supervisor." E.g., *NLRB v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir. 1971). They disagree, principally, on whether Schwartz had the authority to independently assign and responsibly direct his warehouse coworkers in the course of their duties. The Board, conceding as it must that Schwartz did exercise some leadership over the performance of the warehouse, work, claims that any authority he did exercise did not require the use of independent judgment but was of a merely routine nature. The respondent company contends that Schwartz was appointed the warehouse supervisor by Clark with the authority to independently assign and direct his coworkers. We believe the record, when viewed as a whole, supports the company's contention rather than the Board's finding.

In support of its finding that Schwartz was not a supervisor, the Board majority seized upon the following facts. It noted that Schwartz never exercised any power to hire, fire, transfer, grant time off, assign overtime, or even move people in and out of the warehouse from the assembly line during his three-week tenure in the warehouse. Moreover, the Board deemed significant the fact that Schwartz was fired as production supervisor precisely because he was ineffective in a supervisory role. Accordingly, says the Board, it would be anomalous to infer that Schwartz was laterally transferred to another supervisory position rather than demoted after Smith's arrival as plant manager. Finally, though acknowledging that Schwartz exercised some direction over performance of the warehouse work, the Board characterized such direction as growing out of Schwartz's experience with what needed to be done and how to go about

doing it, rather than arising out of any inherent authority he was given over his coworkers. The routine and menial nature of the job, says the Board, did not call for the exercise of any independent judgment characteristic of supervisory status.

Viewed in isolation from other evidence of record, we believe the above facts might be sufficient to support the Board's inference that Schwartz became a warehouse employee after being dismissed as production supervisor, even though there is little direct evidence indicating that Clark specifically intended to demote Schwartz from supervisory to rank and file status. However, when account is taken of the fact that Schwartz was told he was being put "in charge" of the warehouse and was subsequently reprimanded by Clark for not keeping the warehousemen busy, the reasonableness of the demotion inference the Board drew becomes highly questionable. The administrative law judge credited the testimony regarding Clark's reprimand of Schwartz but deemed it "largely irrelevant" in view of the fact that the reprimand took place before Smith assumed the duties of plant manager and production supervisor. As Board Member Kennedy pointed out in his dissent, however, the administrative law judge was simply wrong on the facts, for the record established beyond doubt that the reprimand occurred 3 days after Smith had reported for work and Schwartz had been transferred to the warehouse. In view of the above, there can be no doubt that Clark intended that Schwartz have the authority to control his coworkers and held Schwartz accountable for the performance of his warehouse subordinates. This alone would seem to settle the question of whether Schwartz had the authority, in the interest of the employer, to responsibly direct his fellow employees in the course of their duties. E.g., *NLRB v. Fullerton Publishing Co.*, 283 F.2d 545, 549–50 (9th Cir. 1960). The record, however, tells us not only that Schwartz had such authority, but also that he in fact exercised it.

■ Schwartz's own testimony convincingly establishes that he in fact exercised authority to direct the warehousemen in the course of their duties. Indeed, even apart from the specifics supplied by Schwartz, the whole tenor of his testimony suggests that he believed he had such authority:

"I would tell them who I wanted up in the truck, . . . I would instruct them as to what I wanted moved and how I wanted it placed back. . . . I would instruct the boys what I wanted them to do, and I would just walk back and forth between the two spots to make sure they went into the spots where we wanted it."

To be sure, as the Board argues, the supervision of the menial work in which the warehousemen were engaged did not call for the exercise of sophisticated judgment. That the choices Schwartz had in assigning and directing work were severely circumscribed by the menial nature of the tasks performed and the limited skills of his coworkers, however, does not mean that Schwartz was not called upon to use his own judgment in the course of the job. Cf. *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977). The fact of the matter is that the record as a whole clearly establishes that Schwartz exercised *independent* judgment in assigning particular tasks to particular employees and in supervising performance of the most minute details of the warehouse work.

Furthermore, we note that other secondary indicia of Schwartz's supervisory status abounds that sharply undercuts the validity of the Board's finding that Schwartz was simply a rank and file employee. For example, Schwartz received no diminution in pay and continued to be paid on days that other production and warehouse employees were laid off because of methanol shortages—facts that undermine the reasonableness of the Board's inference that he was *demoted* from an admittedly supervisory status to that of a rank and file employee. Moreover, Clark held Schwartz accountable not only for supervising the warehouse work, but also for implementing a new in-

ventory control system in concert with Danny Smith, the new plant manager and production supervisor. Indeed, it was Schwartz's deficiencies in that respect that allegedly prompted his dismissal. If in fact Schwartz was considered merely a rank and file employee rather than a supervisor, dismissal for failing in responsibilities not assumed by other coworkers would seem unduly harsh. The more appropriate response would have been simply to give the responsibility for keeping track of inventory to another worker and to reduce Schwartz's pay to that of his coworkers. We also doubt that Schwartz would have lasted as long as he did in the warehouse if he were simply a rank and file employee, for according to his own estimate Schwartz spent only 50% of his time in manual labor. The fact that Schwartz's own immediate supervisor, plant manager Smith, would countenance this cannot be explained away by the fact that, as the Board would have it, Schwartz was a trusted senior employee. Indeed, it seems unlikely that Schwartz's coworkers themselves would have stood for another rank and file employee's bossing them around and refusing to carry a fair share of the workload simply because he was, as the Board suggests, a self-appointed team leader. In sum, we believe the evidence as a whole compels the conclusion that Schwartz's authority over the warehouse employees came from, and was exercised in the interest of, his employer and did not stem, as the Board would have it, from his long experience with the sophisticated details of warehouse work or his charismatic leadership ability.

Nor do we find persuasive the administrative law judge's reasoning that, if Schwartz were a supervisor, this would mean that the company had two supervisors for a work force that never reached a figure of more than 12 and occasionally was as low as 4. The fact is that, as Board Member Kennedy noted in his dissent, the company had always had a production line supervisor and a warehouse supervisor prior to Clark's hiring of Smith as plant manager and production supervisor. Moreover, following Smith's arrival, Schwartz was regularly denominated on the company's daily production records as the warehouse supervisor on days when the plant was in full production.

In view of all of the above, we are compelled to the conclusion that the record as a whole does not support the Board majority's finding that Schwartz was a rank and file employee rather than a supervisor. The inferences the Board drew from the facts of record simply do not stand up to searching analysis and are inconsistent with the manifest weight of the evidence considered as a whole. We find that there is no substantial evidence supporting the Board's finding and, accordingly, set aside the Board's determination that Oscar Schwartz was an employee within the meaning of Section 2(3) of the Act.

### III.

Having determined that Schwartz was a supervisor within the meaning of Section 2(11) of the Act, the only remaining issue is whether the respondent violated Section 8(a)(1) of the Act by promising its employees substantial benefits on the eve of an NLRB election in order to induce them to vote against unionization.

The allegedly "substantial" benefits promised by the company were contained in a speech made by Clark to the employees on the eve of the NLRB election conducted at the plant. In his campaign speech, Clark stated that, although he could not guarantee anything, he believed that he had finally found a reliable source of methanol. This statement was of great interest to the employees, for the plant's production line had been periodically shut down for want of sufficient methanol. The Board also grounded its finding of a Section 8(a)(1) violation on another statement Clark made the next day to an employee who had not attended his speech. Allegedly, Clark said he would "guarantee" a five-day, forty-hour work week because he had found a reliable source of methanol. Clark denied making any such promise, but the administrative law judge credited the employee's

contrary testimony that Clark had in fact given her a "guarantee."

Member Kennedy dissented from the Board's finding that either statement violated Section 8(a)(1) of the Act. As to the campaign speech, Kennedy found nothing unlawful in an employer's making a truthful statement concerning material shortages that had previously caused work stoppages, particularly in view of the fact that Clark had cautioned the employees in his speech that he could not guarantee anything. As to the incident the following day, Kennedy reasoned that it was unlikely that Clark, having carefully refused to guarantee anything to the employees in his campaign speech, would have made any such statement as had been alleged. Moreover, the alleged "guarantee" to a single employee was an isolated matter insufficiently significant in itself to constitute a Section 8(a)(1) violation.

Like Board Member Kennedy, we do not believe that Clark's campaign speech statement constituted a promise of substantial benefit violative of Section 8(a)(1) of the Act. In his speech Clark guaranteed nothing to the employees, and his simple statement that he had found a reliable source of methanol was not in itself a "promise" of anything. To be sure, Clark's statement may have been motivated by an intent to allay the employees' dissatisfaction over the periodic shut downs of the plant's production line, and thus to influence their vote on the question of unionization. The intent underlying his statement, however, does not turn a simple campaign statement into a "promise of benefit" violative of Section 8(a)(1).

As to Clark's statement to an employee on the day of the election that he could "guarantee" a five-day, forty-hour work week, we again agree with Member Kennedy that the statement did not constitute an unfair labor practice under Section 8(a)(1). As Board Member Kennedy noted, the statement was an isolated one. More important, the alleged "guarantee" concerned a matter over which Clark himself had little control. His "guarantee," when viewed in the context of his entire conversation with the employee and the history of the plant's production problems, was necessarily conditioned on the company's ability to obtain a reliable source of methanol. The fact of the matter is that, if the company obtained an adequate supply of methanol its production line would work to capacity irrespective of any promises made by Clark or any actions concerning unionization taken by the employees, for it was as much in the self interest of the employer to keep the production lines open as it was in the interest of the employees. Under the circumstances, we do not believe that any "guarantee" made by Clark could have had the potentially coercive impact on the free exercise of rights guaranteed by Section 7 that Section 8(a)(1) is designed to protect against. Simply put, the potentially coercive influence of the "fist inside the velvet glove" is not present here. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964).

Accordingly, we deny enforcement of the Board's order for the reasons noted above.

ENFORCEMENT DENIED.