**AMERICAN DIVERSIFIED FOODS, INC., d/b/a Arby's, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–1051.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1980.

Decided Feb. 24, 1981.

---

26. *See* p. 8, *supra.*

Wayne O. Adams, III, Indianapolis, Ind., for petitioner.

John D. Burgoyne and Elliott Moore, N. L. R. B., Washington, D. C., for respondent.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

PELL, Circuit Judge.

American Diversified (American or Company) has petitioned this court to review, and the Board has cross-petitioned this court to enforce, a Board order finding that American violated § 8(a)(1), and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3), by discharging two "shift managers" employed at one of the company's "ARBY" restaurants in Bloomington, Indiana. The two shift managers, John Fry and Carl Steffes, were admittedly fired for engaging in union organizational activity.

The company claims, however, that it did not violate the Act by discharging Fry and Steffes because shift managers are "supervisors" as defined in § 2(11) of the Act, and thus excluded from the Act's definition of "employee" contained in § 2(3). 29 U.S.C. § 152(11), (3). After a hearing, Administrative Law Judge (ALJ) Karl H. Buschmann disagreed and held that Fry and Steffes were not supervisory employees. This finding was adopted by the Board when it held that the company violated § 8(a)(1) and (3) in the discharges, 247 N.L.R.B. No. 9 (1980), which holding is the subject of the petition to this court.

Section 2(11) defines "supervisor" as any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). As in most cases involving definitional sections, the exact boundaries of the definition are not precise with the gaps to be filled by subsequent case law. In filling these gaps, the Board is given a substantial amount of discretion and it is well established that the Board shall be affirmed in its determinations if they are supported by substantial evidence. *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723 (7th Cir. 1977).

In applying the "substantial evidence" test, however, we are not empowered to rubber-stamp the Board's decision simply because the supporting evidence may be "substantial" when considered by itself and in isolation from the evidence that fairly detracts from the Board's conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, [463–

---

* Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

466], 95 L.Ed. 456 (1951). Rather, we must take into account the entire record, including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn. *Id.* at 487–88, 71 S.Ct. 456 [at 463–64]. If, when so viewed in its entirety, the record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion," we must accept the Board's findings. *Id.* at 477, 71 S.Ct. 456, [at 459]. On the other hand, if the record as a whole "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence," we must set aside the Board's findings. *Id.* at 490, 71 S.Ct. at 466.

*Id.* at 727.

The facts in this case reveal that the shift managers, usually three or four in each restaurant, are third in the ARBY hierarchy behind the store manager and one or two assistant managers, but ahead of approximately 25 counter employees. The unit manager is a salaried managerial employee hired by corporate management and is primarily responsible for the restaurant unit and oversees all aspects of the unit's operation. The assistant manager is also a salaried employee hired by the corporation who aids the manager in carrying out his responsibilities. The shift managers, on the other hand, are hourly-paid employees who are usually promoted by the unit management from the rank of counter employee.

A typical ARBY's restaurant is open seven days a week for two eight-hour shifts each day. Each shift is headed by a "duty manager." Of these 14 shifts, the store manager is the duty manager for four shifts, the assistant manager is the duty manager for four shifts, and the shift managers act as duty managers for the remaining six shifts, usually in the evenings or on weekends. The shift managers spend 40 to 60 percent of their working time as duty managers with the remainder spent as regular counter employees. When the shift managers are serving as duty managers, they are, with the exception of a one-hour overlap period between shifts, the highest ranking employee in the restaurant.

The duty managers' responsibilities include maintaining the inventory and cash receipt records, controlling the cash resources, and the opening or closing of the restaurant at the beginning or end of the business day, depending upon the shift they manage. The duty managers use the restaurant manager's desk for their paperwork which includes the maintaining of a daily log of activities and occurrences at the restaurant and personnel information. They are responsible for assigning counter employees to specific jobs, replacing absent employees, and sending employees home when they are sick or when work is slow. They are also responsible for enforcing the company's dress and behavior rules and allocating work breaks. On at least one occasion, the duty manager, in this case a shift manager, orally reprimanded a counter employee for misbehavior. In short, during those times that the shift managers serve as duty managers, they are in charge of the restaurant's operation.

Shift managers are paid on an hourly basis at a rate of thirty-five cents an hour greater than counter employees when the shift managers serve as duty managers, and twenty cents an hour greater at other times. Other benefits the shift managers receive beyond those given counter employees include paid work breaks and one week's paid vacation after one year's employment. They are also eligible for monthly performance bonuses.

In his opinion holding that shift managers were not "supervisors," the ALJ relied upon the fact that shift managers were without independent authority to hire, fire, transfer, or discipline counter employees. Although the ALJ acknowledged that shift managers did occasionally effectively recommend that certain employees should be fired or other persons hired, he noted that counter employees also did so, or could have done so. The Judge further held that the instance of the shift manager issuing an oral reprimand was an isolated example,

and that the duties regarding work assignments and opening and closing responsibilities were routine and did not require the exercise of independent judgment.[1] The ALJ finally held that neither the company nor the shift managers themselves considered the shift managers to be supervisors, and that the evidence of the counter employees' perceptions was "ambiguous."

When viewed as a whole, we do not believe that substantial evidence supports the Board's conclusions. It is well established that only one of the criteria mentioned in § 2(11) need be present to justify a finding that the questioned occupation is supervisory. *NLRB v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir. 1971). Furthermore, although the ALJ was correct in holding that supervisory jobs require the exercise of some degree of independent judgment, *NLRB v. Sayers Printing Co.*, 453 F.2d 810, 814 (8th Cir. 1971), the fact that the exercise is infrequent does not lessen the supervisory status. In *Oil, Chemical and Atomic Workers, Int'l Union v. NLRB*, 445 F.2d 237, 244 (D.C. Cir. 1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972), for example, the court stated, "once the existence of supervisory authority is established, the degree or frequency of its exercise is of little consequence." Similarly, in *Ohio Power Co. v. NLRB*, 176 F.2d 385 (6th Cir. 1949), *cert. denied*, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553, the court stated that § 2(11) ". . . does not require the exercise of the power described for all or any definite part of the employee's time." The Board has also agreed with these statements in the past. *See Graves Trucking, Inc.*, 246 N.L.R.B. No. 52 (1979). In this case, shift managers, at least for a substantial portion of the time they are acting as duty managers, exercise independent judgment.

Initially, we are impressed with the fact that for the great majority of the time shift managers are acting as duty managers, they are the highest ranking employees present in the restaurant. At these times, they have sole responsibility for the compliance with all company rules by the counter employees, for cash receipts and resulting records, and for the following of proper closing and opening procedures. The company employee manual states, in fact:

> All shift managers (non-salaried duty managers) are directly responsible to unit management and Company, American Diversified Foods, for following and enforcing all unit and Company rules and procedural policies on the shifts which they manage.

The fact that the questioned employees are the ranking employees present at the worksite has led the Board to a finding of supervisory status. *E. g., Graves Trucking, supra; Mid-Continent Refrigerated Service Co.*, 228 N.L.R.B. 917, 920 (1977), *and see Colorflow Decorator Products, Inc.*, 228 N.L.R.B. 408, 410 (1977).

The record also establishes that shift managers are responsible for assigning work to the counter employees during their shifts. Although the ALJ was correct in finding that this responsibility operated only within certain legal boundaries and common sense limitations, the discretion is not restricted by any written company policy or directive. The record shows that the shift managers exercise sufficient independent judgment when making these decisions. Although external considerations clearly affect the shift manager's discretion when making these assignments, nothing prevents the shift manager from basing his decision, at least in part, on the requirements of the specific job and his opinion of the counter employee's individual capabilities. This is a sufficient exercise of his independent judgment. *NLRB v. Pilot Freight Carriers, Inc.*, 558 F.2d 205, 209 (4th Cir. 1977), *cert. denied*, 434 U.S. 1011, 98

---

1. The ALJ found, for example, that the assignment to the meat slicer station was restricted by a minimum age requirement of the state law, and noted that the length of the employee's shift "appeared to have been the determining factor in an employee's work position."

S.Ct. 723, 54 L.Ed.2d 754 (1978); *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir. 1977), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85; *and see NLRB v. Big Ben Dept. Stores, Inc.*, 396 F.2d 78, 82 (2d Cir. 1968). The fact that the work the shift manager supervises is not complex and does not require close attention does not weaken a finding of supervisory status. *Sourdough Sales, Inc.*, 246 N.L.R.B. No. 20 (1979); *Colorflow Decorator Products, Inc., supra* at 411. In *Adam and Eve Cosmetics, supra*, this court specifically held, for example, that the supervision of menial work in that case "did not call for the exercise of sophisticated judgment." 567 F.2d at 728. However, the court went on to find that this fact did not mean that the employee "was not called upon to use his own judgment in the course of his job." *Id.* As in that case, we are satisfied that the shift managers here exercised sufficient independent judgment in assigning particular tasks to particular employees.

Additionally, the shift managers meet twice a month with the unit management to discuss personnel problems and store procedures. At these meetings, and by the entries and comments made in the daily logs kept by the duty managers, the shift managers can effectively recommend promotions, hirings and firings. Importantly, the counter employees know of these meetings and the logs and, perhaps unnecessarily therefore, the company manual states:

> All personnel are to give shift managers the same respect that they give the assistant manager and the store manager.

It is also interesting to note that one counter employee testified that although she did not think shift managers were supervisors in what she believes was the "legal sense," "in the dictionary sense, a supervisor would be one who supervises and I would have to say that [the shift managers] did supervise."

These factors, when viewed with the facts that shift managers have the responsibility to replace absent employees, decide which employees are to leave early, and allocate work breaks, indicate to us that they are supervisors as that term is defined in § 2(11). They possess "independent judgment" because they exercise discretion in assigning work, work breaks and early leave privileges. Furthermore, there is a substantial possibility that fraternal feelings arising from the unionization of these shift managers might interfere with the proper exercise of the duty manager's responsibility in carrying out the employer's policies. *NLRB v. Pilot Freight Carriers, Inc., supra* at 207. There is also the possibility that the counter employees might be pressured into union membership, or that the shift managers might be able wrongly to maintain a senior union position, due to the potential misuse of the shift manager's supervisory powers. *C&W Supermarkets, Inc. v. NLRB*, 581 F.2d 618, 620–21 (7th Cir. 1978); *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1178 (2d Cir. 1968).

In short, shift managers exercise the type of powers described in § 2(11) and finding them to be "supervisors" within the meaning of the Act complies with the policies behind the exclusion of supervisors from the Act's prescriptions. Cases based upon similar factual circumstances are in accord. *See Ohio Power Co., supra; Pilot Freight Carriers, Inc., supra; Dynamic Machine Co., supra; Fredericks Foodland, Inc.*, 247 N.L.R.B. No. 38 (1980); and *Colorflow Decorator Products, Inc., supra.* The Board's order, therefore, is denied enforcement.

ENFORCEMENT DENIED.