**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AJAX TOOL WORKS, INCORPORATED, Respondent.**

No. 81–2747.

United States Court of Appeals, Seventh Circuit.

Submitted July 7, 1983.*

Decided Aug. 2, 1983.

---

* After preliminary examination of the briefs, the Court notified the parties that it had tentatively

concluded that oral argument would not be helpful to the Court in this case. The notice

provided that any party might file a "Statement as to Need of Oral Argument." *See* Rule 34(a), Fed.R.App.P.; Circuit Rule 14(f). Such a statement was filed by respondent on March 19, 1982. Upon consideration of that statement, the briefs, and the record, the request for oral argument is denied and the appeal is submitted on the briefs and record.

Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

John B. Dillon, Concannon, Dillon, Snook & Morton, Chicago, Ill., for respondent.

Before BAUER, WOOD, and ESCHBACH, Circuit Judges.

PER CURIAM.

This application for enforcement of the Board's order raises two issues: (1) whether employee Piotrowski was a supervisor within the meaning of section 2(11) of the National Labor Relations Act; and (2) whether Piotrowski and Shea, an admitted supervisor, violated section 8(a)(1) of the Act by unlawfully interrogating employees concerning their union activities. For the following reasons, we grant enforcement of the Board's order.

## I. THE SUPERVISORY STATUS OF PIOTROWSKI

### A. FACTS

The following factual findings of the ALJ, which we conclude are supported by substantial evidence on the record as a whole, were adopted by the Board on review. Respondent, Ajax Tool Works, Inc., is an Illinois corporation engaged in the business of manufacturing chisels. In April, May, and June of 1980, the night shift at respondent's Franklin Park plant consisted of approximately 30 hourly-paid employees working from 4:00 p.m. to 1:30 a.m. in two departments, the machine shop and the forge shop. The night shift comprised approximately one-third of respondent's total work force.

David Shea, foreman of the forge shop, and Joe Capriatti, foreman of the machine shop, both admitted supervisors, worked on

the day shift, and usually left the plant by 5:00 p.m., leaving Peter Piotrowski as the single "leadman" on the night shift for the two departments. Piotrowski was knowledgeable in the operation of the plant and its machinery, especially the machine shop. He was familiar with the entire line of chisels produced by the company, and knew all of the machine settings and the adjustments necessary to produce each variety.

Piotrowski was the highest paid hourly-rated employee in the plant. All of his superiors were salaried. He reported for work daily at 3:00 p.m., one hour before the remaining employees on the night shift. Between 3:00 p.m. and 4:00 p.m., Shea and Capriatti briefed him on the night shift production requirements. They generally left Piotrowski to implement their instructions. He assigned night shift employees to particular tasks on particular machines in a manner consistent with Shea's and Capriatti's instructions. With respect to the machine shop, this meant that Piotrowski decided which of the 18 employees would work on which machine; with respect to the forge shop, this decision apparently was made by foreman Shea, to be implemented by Piotrowski.[1]

When the night shift employees arrived at work, they checked with Piotrowski as to which tasks they were to perform because he frequently changed their assignments. Although they usually worked on the same machine as the previous day, at times they were reassigned to another machine, and often they were given a new task on the same machine. When an employee had finished a specific task during the shift, Piotrowski reassigned him to another. When necessary, Piotrowski was expected to "set up" machines for the production run. He also made adjustments in the settings as needed, and at times attempted to repair machines broken on the night shift. When a machine became dysfunctional, he assigned the operator to another machine or task. When not performing these enumerated duties, Piotrowski sat at his desk and read.

Piotrowski had no authority to hire or fire employees on his own initiative; he was, however, responsible for seeing that production requirements and quality standards were met, and that discipline was maintained. On one occasion, employee Villegas handled an order incorrectly; Piotrowski rejected it and required Villegas to do it again. On another occasion, Piotrowski ordered Villegas to refrain from attempting to repair a machine, stating that it was not his job to do so. Piotrowski enforced the ten minute limit on coffee breaks, and generally ensured that working time was spent working. Piotrowski's orders generally were obeyed, presumably because they were backed by a degree of power. On one occasion, he sent an employee home, with consequent loss of pay, for reading a novel in the washroom. On another occasion, Piotrowski argued with an employee and threatened to have him fired. The employee subsequently was discharged.[2]

1. Shea so testified, as did forge shop employee Olivio. Respondent cites this testimony as evidence that Capriatti too made assignments in the machine shop. Capriatti did not testify; the ALJ credited the testimony of machine shop employees Diaz and Villegas, who stated that Piotrowski made work assignments in the machine shop. Respondent argues that neither could have known whether Piotrowski was exercising independent judgment in assigning the work or merely carrying out Capriatti's instructions. Respondent conveniently chooses to ignore Piotrowski's testimony; when questioned by General Counsel, Piotrowski testified that he made work assignments. It was only in response to leading questions by respondent's counsel that Piotrowski agreed that both Shea and Capriatti assigned night shift employees to particular machines and tasks. The ALJ credited Piotrowski's "initial, spontaneous, and somewhat detailed answer," corroborated as it was by credible witnesses. Credibility determinations, of course, should "not be overturned by a reviewing court absent extraordinary circumstances," which are not present here. *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 687 (7th Cir.1982).

2. The ALJ noted that although respondent's witnesses testified that Piotrowski had no authority to recommend discharge or to send an employee home with consequent loss of pay, they never disputed these specific illustrative examples, which were provided by three credible witnesses.

On several occasions, Piotrowski sent home men who were too intoxicated to work safely; he was authorized by respondent to do so. Piotrowski had instructions to telephone the plant manager or company president whenever an emergency arose that he could not handle; this did not occur frequently. The employees who testified viewed Piotrowski as the equivalent of a supervisor. Piotrowski identified his position as that of "supervisor" of the night shift when first questioned on his company status, and according to his testimony, he viewed himself as the individual "in charge."

If an employee failed to punch a time card, Piotrowski initialled the card to vouch for the time. In addition, employees were required to report to him if they wanted time off. Piotrowski was the sole night shift employee who possessed keys to the plant and to a desk wherein valuable company property was stored. He was responsible for locking the plant each night after all employees had left.

At appropriate times, Piotrowski testified, he discussed with the foremen whether particular employees should receive raises, and he made recommendations. Two company witnesses testified that he did not. The ALJ noted that the conflicting testimony probably stemmed from different conceptions of the term "recommendation," respondent's witnesses apparently contending that formal recommendations were not elicited or received, and Piotrowski contending that the foremen asked his opinion. The ALJ found obvious the fact that the company would have been unable to make informed decisions on prospective raises absent an evaluation by the only individual well-informed on night shift employees' attitudes and conduct, factors admittedly considered.

On the basis of these facts, the ALJ concluded that Piotrowski was a supervisor within the meaning of § 2(11) of the National Labor Relations Act, with authority to direct responsibly the work of other employees. Noting that although many of Piotrowski's duties were routine in nature, and some were clearly those of a skilled employee rather than a supervisor, the ALJ stressed that Piotrowski was solely responsible for the plant on the night shift, for directing the work of the 30 night shift employees, for meeting shift production requirements, for meeting quality standards, and for maintaining discipline. The ALJ also noted that if Piotrowski were not a supervisor, the entire night shift would have been without supervision of any kind from 5:00 P.M. to 1:30 A.M.

### B. *DISCUSSION*

■ Section 2(11) of the National Labor Relations Act defines the term "supervisor" as follows:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

It is well-established that section 2(11) is to be read in the disjunctive; possession of any one of the above indicia of supervisory status is sufficient to render an employee a statutory supervisor. *See, e.g., NLRB v. Brown Specialty Co.,* 436 F.2d 372, 375 (7th Cir.1971).

The parties disagree on whether Piotrowski had the authority to independently assign and responsibly direct his night shift coworkers. Respondent contends that any authority possessed or exercised by Piotrowski did not require the use of independent judgment, but was merely of a routine nature.

■ As an initial matter, respondent contends that because neither the ALJ nor the Board made a specific finding that Piotrowski exercised independent judgment in directing the work of other employees, the

conclusion that Piotrowski is a supervisor is insufficient as a matter of law. We find no merit in this argument. Although the ALJ did not track the exact language of section 2(11) in drafting his findings, he concluded that Piotrowski was a supervisor after noting that many of his duties were routine in nature. Implicit in this conclusion is a finding that Piotrowski exercised independent judgment in directing the work of other employees. The language of the ALJ's "concluding findings" clearly was meant to convey the concept of independent judgment. *See Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977).

Having concluded that the findings of fact were supported by substantial evidence on the record as a whole, we turn to an examination whether the conclusion that Piotrowski was a supervisor has a reasonable basis in law. In reviewing cases involving this issue, we permit the Board "a large measure of informed discretion." *NLRB v. Process Corp.*, 412 F.2d 215, 218 (7th Cir. 1969).

■ The ALJ concluded that in the machine shop, Piotrowski determined which employee would operate which machine. Uncontroverted evidence also revealed that Piotrowski was responsible for reassigning employees when they had completed a particular task during the shift. No evidence was presented that Shea and Capriatti briefed Piotrowski on reassignments. Although the ALJ did not specify which factors were taken into account in making assignment and reassignment decisions, it seems apparent that Piotrowski had to assess the requirements of the job and the relative abilities of particular employees in making assignments that would allow the production quotas to be met. Such discretion must be exercised in accordance with a managerial judgment as to the best interests of the employer. *Cf. NLRB v. Res-Care, Inc.*, 705 F.2d 1461 (7th Cir.1983). No evidence was adduced that work was assigned automatically to the employee who was operating the particular machine on which the job had to be run. Although the reassignments may not have called for the exercise of sophisticated judgment, it appears that the decisions involved the exercise of some independent judgment. The same is true of the initial work assignments in the machine shop. This is a sufficient basis for a finding of supervisory status. *See American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893 (7th Cir.1981); *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723 (7th Cir.1977); *Dynamic Machine Co. v. NLRB, supra*, 552 F.2d at 1201.

We further note that Piotrowski was responsible for ensuring that quality standards were met. On one occasion Piotrowski rejected an incorrectly handled order and required the employee to redo it. We believe this action required an exercise of independent judgment.

The record is replete with other indicia of Piotrowski's supervisory status: (1) he was responsible for maintaining discipline and for ensuring that working time was spent working; on one occasion he sent an employee home with consequent loss of pay for reading a novel in the washroom; he was authorized by respondent to send home men who were too intoxicated to work safely; he exercised this authority on several occasions; (2) there is evidence that Piotrowski effectively recommended that an employee be discharged, *cf. NLRB v. Harmon Industries, Inc.*, 565 F.2d 1047, 1050 (8th Cir. 1977); (3) Piotrowski was responsible for locking the plant each night; (4) Piotrowski spent no time engaged in actual production activities; when not setting up or adjusting machines or directing the work of other employees, he sat at a desk and read, *cf. NLRB v. Monroe Tube Co., Inc.*, 545 F.2d 1320, 1324–25 (2d Cir.1976); *NLRB v. Orr Iron, Inc.*, 508 F.2d 1305 (7th Cir.1975) (per curiam); *Precision Fabricators v. NLRB*, 204 F.2d 567 (2d Cir.1953); and (5) Piotrowski was the highest-ranking employee in the plant on the night shift; if Piotrowski were not a supervisor, one-third of respondent's total work force would be without supervision, *see Southern Indiana Gas & Electric Co. v. NLRB*, 657 F.2d 878, 886 (7th Cir.

1981); *American Diversified Foods, Inc. v. NLRB, supra,* 640 F.2d at 896.

Having reviewed the entire record, including evidence that fairly detracts from the Board's conclusion, we find that it contains "such evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Although we justifiably may have reached a different conclusion had the issue been before us *de novo,* we do not have the power to "displace the Board's choice between two fairly conflicting views . . . ." *Id.* at 488, 71 S.Ct. at 465.

## II. *THE UNLAWFUL INTERROGATIONS*

### A. *FACTS*

Upon a careful review of the record, we conclude that the following factual findings on the unlawful interrogations are supported by substantial evidence. During April and early May of 1980, Luis Diaz actively began to organize respondent's employees on behalf of the United Auto Workers. Word of this activity was quickly disseminated throughout the plant, and management admittedly was aware of rumors of the organizational drive.

On one occasion, when Diaz and several coworkers were having coffee in the company cafeteria, Piotrowski approached them and asked, "What is happening? Are you forming the union?" Diaz replied that they were talking about baseball. Piotrowski responded that he thought they were talking about the union; he then left. Similar exchanges were repeated on two or three occasions within the next few days, always when two or more employees had gathered to have coffee. Piotrowski consistently asked, "Are you forming the union?" Diaz consistently denied discussing or forming the union.[3] On May 12, 1980, near employee Hill's work station and in the presence of Diaz and several unnamed employees, supervisor Shea asked employee Olivio, "Are you in the union?" Three days later, as Olivio and several coworkers were standing near the bulletin board, on which was posted a notice of a future union meeting, Shea approached, read the notice, and commented, "That is garbage. If you want to go, go, but that won't help you." On May 15, Piotrowski approached employees Villegas and Bolano, who were standing near the coffee machine, and asked, "Are you talking about the union, or what?" Villegas denied discussing the union. This identical scenario was repeated one week later.

The ALJ concluded that respondent's interrogation reasonably tended to interfere with the exercise by the employees of their section 7 rights in violation of section 8(a)(1) of the Act. The ALJ stressed several factors: the nature of the questioning, the lack of justification for it, the number of times it was repeated, the timing of the interrogation (early stages of an organizational campaign when it would be intimidating to employees affiliated or considering affiliation with the union), the dishonesty of the employees' replies, and Shea's declaration of anti-union animus. The ALJ's finding that respondent unlawfully interrogated its employees during the early stages of an organizational campaign was adopted by the Board on review.

### B. *DISCUSSION*

Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights to organize and bargain collectively through chosen representatives. 29 U.S.C. § 158(a)(1) (1976). In order to establish an 8(a)(1) violation, it need not be shown that an attempt at coercion succeeded; the test is whether the employer engaged in conduct which reasonably tended to interfere with, restrain, or coerce employees in the exercise of their section 7 rights. *Jays Foods, Inc. v. NLRB,* 573 F.2d

---

**3.** These conversations were testified to by Diaz. Respondent's counsel never questioned Piotrowski about them.

438 (7th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).

Our analysis of respondent's conduct is prefaced by several basic propositions: "Section 8(a)(1) does not prohibit all employer questioning of employees about union activities." *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 689 (7th Cir. 1982). "Isolated interrogation, free of coercive statements and absent resort to systematic intimidation, does not constitute an unfair labor practice but falls within the free speech protection of the Act." *NLRB v. Century Broadcasting Corp.,* 419 F.2d 771, 780 (8th Cir.1969) (citations omitted). A violation is established only when the questions asked, "viewed and interpreted as the employee must have understood the questioning and its ramifications," could reasonably tend to coerce or intimidate the employee with respect to union activities. *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 624 (7th Cir.1981).

■■■ Several factors are relevant to the determination whether the employer's conduct reasonably could have tended to intimidate the employees or to induce fear of reprisals in them: (1) the background of the employer-employee relationship, specifically the presence or absence of a history of employer anti-union animus; (2) the questioner's status in the company hierarchy, with special emphasis on employee perceptions of the questioner's status; (3) the nature of the information sought; (4) the place and method of interrogation; and (5) the truthfulness of the reply. *First Lakewood Associates v. NLRB,* 582 F.2d 416, 419 (7th Cir.1978). We emphasize that these factors are not exclusive; we must consider all relevant circumstances, including whether the questions were accompanied by a persuasive, legitimate explanation for the employer's interest, *id.,* and whether the questioned employee was assured that no reprisals would follow his response, *Satra Belarus, Inc. v. NLRB,* 568 F.2d 545, 548 (7th Cir.1978).[4]

■■ Coercive interrogation is one of the subtler means by which an employer interferes with an employee's protected rights.[5] The interrogation often is not overtly intimidating or coercive, and it is difficult to determine how often, and under what circumstances, a threat of retaliation will be inferred by the employees.[6] The above enumerated tests are not definitive, and coercion may occur even when all factors cut in favor of the employer.

The instant case involved seven separate incidents of allegedly unlawful interrogation. Although supervisor Shea denied questioning employee Olivio, substantial evidence on the record considered as a whole supports the findings of fact. Whether the findings of section 8(a)(1) violations predicated upon these facts have a reasonable basis in law is a closer question. Analyzed as discrete occurrences, each of these incidents is seemingly innocuous, and viewed separately might not amount to a violation of section 8(a)(1). It is clear, however, that the ALJ's assessment was influenced by the repetitious nature of the inquiries. "A continuous course of conduct may be a circumstance coloring employee perception of individual instances of seemingly innocuous conduct." *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1114 (7th Cir.1973) (citations omitted).

It also should be noted that each incident of interrogation took place when several employees were gathered together. Although it is not possible to determine from

---

4. Still other factors to be considered in assessing the employer's conduct are: (1) whether the evidence reveals a continuous course of persistent, intensive questioning, *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1114 (7th Cir.1973); (2) whether the employer questioned a large number of employees, *Utrad Corp. v. NLRB,* 454 F.2d 520 (7th Cir.1971); and (3) whether the employees questioned were actively involved in the organizational effort, *NLRB v. Camco, Inc.,* 340 F.2d 803 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965).

5. Bok, *The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act,* 78 Harv.L.Rev. 38, 106 (1964).

6. *Id.* at 107.

the record the exact number of employees who were present during the seven interrogations, it is reasonable to infer that in view of the relatively small size of respondent's work force, other employees were aware of respondent's repeated questioning.

Respondent stresses that there is no evidence of a history of anti-union animus. Indeed, the ALJ did limit respondent's attempts to establish this, concluding that a showing of anti-union animus was not required to establish the 8(a)(1) violation of unlawful interrogation. However, the ALJ did note Shea's declaration of hostility toward the union which occurred three days after the interrogation of Olivio by Shea. Had the ALJ based his finding of coercive interrogation solely upon this single, isolated declaration of hostility, we would be inclined to deny enforcement of the Board's order. *See Utrad Corp. v. NLRB,* 454 F.2d 520 (7th Cir.1971).

■ We note the nature of the information sought; pointed questions such as "are you forming a union?" and "are you in the union?" are much more coercive than relatively innocuous questions such as "have you heard rumors of union activity?" or "how is the union doing?" In addition, questioning is more likely to have a coercive impact in situations in which the purpose of the interrogation is not explained and there are no assurances against reprisals. A key characteristic of the interrogations in this case is that they were unaccompanied by explicit explanations for respondent's interest. Absent persuasive, legitimate explanations for persistent questioning as to whether employees support the union, they can reasonably infer that the underlying purpose of the interrogation is to segregate union supporters for future reprisals. *First Lakewood Assoc. v. NLRB, supra,* 582 F.2d 416. In this case, each of the employees questioned denied involvement with the union. The untruthful answers elicited from respondent's employees are a strong indication that they feared reprisals.

■ Respondent also stresses that the interrogation occurred either in the employees' work area or in the cafeteria between persons in daily contact, and that the atmosphere was casual and friendly. Respondent further notes that Shea, though an admitted supervisor, was not an officer of Ajax. We agree that the place of interrogation and the rank of the interrogators bear on the issue of coercion; however, assuming the authority of the interrogator to speak for the employer, the crucial question is not his status in the company hierarchy, but whether the employees viewed him as a representative of the company. *NLRB v. Camco, Inc.,* 340 F.2d 803, 806 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). When the interrogator is perceived as an agent of the employer, the coercive nature of the questioning is heightened, and the likelihood that the questions will be perceived by the employees as casual, isolated, or the product of friendly discussion is decreased. *First Lakewood Assoc. v. NLRB, supra,* 582 F.2d at 419. In the instant case, the record shows that the employees viewed Shea and Piotrowski as agents of respondent.

■ In sum, although we find this a close question, the Board's conclusion has a reasonable basis in law. Accordingly, we grant enforcement of the Board's order requiring respondent (1) to cease and desist from interrogating employees about their union sympathies and activities; (2) from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their section 7 rights; and (3) to post notice for 60 consecutive days of its intent to refrain from doing so.