**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The DETROIT EDISON COMPANY, Respondent.**

**No. 75–1662.**

United States Court of Appeals, Sixth Circuit.

Argued March 30, 1976.

Decided June 25, 1976.

Decision modified July 27, 1976.

Elliott Moore, Charles A. Shaw, Deputy Associate Gen. Counsel, N. L. R. B. Washington, D. C., Bernard Gottfried, Director, Region 7, N. L. R. B., Detroit, Mich., for appellant.

Guy Farmer, John A. McGuinn, Patterson, Belknap, Farmer & Shibley, Washington, D. C., for appellee.

Before CELEBREZZE, ENGEL and ADAMS,* Circuit Judges.

CELEBREZZE, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order[1] to bargain collectively issued against the Detroit Edison Company (hereinafter "the Company"). The Board ordered the Company to bargain with Local 458, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "the Union").

In 1973 the Union petitioned for a representation election among the employees in the System Supervisory Division of the Performance Department of the Electrical System Department of the Company. A hearing was held before an Administrative Law Judge. Relying on the record established at the hearing, the Regional Director issued an opinion concluding that the approximately forty employees in question were not supervisory personnel for purposes of the National Labor Relations Act and could be unionized. The Regional Director concluded that the following employees constituted an appropriate unit for purposes of collective bargaining:

All employees of the Employer's system supervisory division at its locations in Detroit, Marysville and Ann Arbor, Michigan, including central system supervisors, senior system supervisors and technical assistants, but excluding office clerical employees, [footnote omitted] and professional employees and supervisors as defined in the Act.[2]

The Regional Director ordered an election. The Company contested this order but to no

---

* The Honorable Arlin M. Adams, United States Circuit Judge, for the Third Circuit, sitting by designation.

1. The order is reported at 216 NLRB No. 174 (March 13, 1975).

2. Joint Appendix, Vol. I, at page 12.

avail. The election was held and the Union won with a 34 "yes" and 2 "no" vote. The Company again contested the results claiming that the employees in question were supervisory and could not be organized. The Company has refused for over a year to bargain with the Union. On March 13, 1975, the Board issued an order directing the Company to bargain with the union. The Board is here seeking enforcement of that order.

The only issue before the Court is whether substantial evidence on the record as a whole supports the Board's conclusion that the system supervisory personnel are employees and not "supervisors" within the meaning of §§ 2(3) and 2(11) of the Act, 29 U.S.C. §§ 152(3), 152(11) (1970).

The Company is a public utility engaged in the production and sale of electric power in a heavily populated 7600 square mile area of southeastern Michigan. The Company assigns to the Electrical System Department responsibility for the safe and continuous transmission of power from the plant to the customer. The Performance Department is one of the three major sub-departments of the Electrical System Department. The System Supervisory Division is a part of the Performance Department. The system supervisors man a central control office in Detroit and district offices in Ann Arbor and Marysville. Each of the offices is responsible for the subtransmission and distribution system within its geographical territory. The Detroit office also has overall system-wide responsibility. The System Supervisory Division is headed by the Chief System Supervisor. Each of the district offices is headed by a Chief District System Supervisor. The parties stipulated that these three individuals were supervisors within the meaning of the Act. The parties also stipulated that two clerk typists were not within the bargaining unit. Employed at the Detroit office, in addition to the Chief System Supervisor, are six Senior System Supervisors, twenty Central System Supervisors, two Shutdown Prearrangement Coordinators and a Technical Assistant. The district offices are each staffed by a Chief District System Supervisor and six District System Supervisors..

The three offices operated by the System Supervising Division coordinate the day-to-day operation of the Company's electrical system. The three offices contain sophisticated electrical equipment which indicates whether the Company's myriad generators, power lines and cables are in working order and functioning properly. It is the responsibility of the system supervisors to monitor various visual display panels and operate communication equipment which connects them with all Company operatives, from high level management officials to on-the-scene repair or installation crews. The three offices operate around the clock, seven days a week. The system supervisors work eight hour shifts. There are three such shifts a day and a total of twenty-one per week. The Chief System Supervisor and the Chief District Supervisors work only the five weekday daytime shifts. The remaining categories of system supervisors work evening and night shifts as well as day shifts, generally on an eight-day on and four-day off basis. Although, throughout the course of a year the system supervisors accumulate substantial overtime.

Senior System Supervisors, Central System Supervisors and District System Supervisors monitor the electrical system. In addition to these duties, the Senior System Supervisors consult on complex problems faced by the other system supervisors and perform some administrative tasks for the chief supervisors. The Company's job description for Senior System Supervisors was introduced as Employer's Exhibit 6 at the administrative hearing. The following is a complete list of the duties described therein:

A. FUNCTIONS as Work Leader for three Central System Supervisors on a shift. REASSIGNS work load when necessary.

B. MAINTAINS overall view of system. Must BE AWARE of vital operating details at all times, and ASSURE that system security is considered in all operations.

C. In cases of very serious trouble, MAKES final decisions regarding priority of corrective actions.

D. PROVIDES backup for District System Supervisors by telephone. IS CONSULTED by them on unusual problems. In cases of serious trouble, may TAKE OVER district service restoration job.

E. KEEPS in close contact with the Shutdown Prearrangements Coordinators Office with regard to clearances on new equipment and equipment in the out-of-commission state, and equipment on which major construction work is proceeding. KEEPS System Supervisors informed of any of these conditions which involve their areas.

F. INFORMS Chief System Supervisor's Office of any unusual happenings during office hours; after office hours, MAKES reports to Duty Officer and Department Management. WRITES reports of system activities.

G. IS RESPONSIBLE for turning over to the incoming Senior System Supervisor on the next shift information regarding system status, trouble jobs, and complex cutovers.

H. CARRIES OUT any and all duties of a System Supervisor when necessitated by vacation schedules, illness, or volume of work.[3]

The introduction to the System Supervising Division Handbook describes the responsibility delegated to system supervisors:

The text of the manual is arranged under three General classifications.: Rules, Recommended Procedures, and Information.

The "Rules" are to be considered as orders to be deviated from only when it is evident that the intent of the principle for which the rule is drafted would be achieved best by such deviation.

The "Recommended Procedures" are to be considered as desirable interpretations of the principles established for operation and protective tagging, drafted chiefly to insure uniformity of procedure. They may be departed from, when, in the judgment of the Supervisor, the situation necessitates such action.

The "Information" is to be considered as just that—included to provide the System Supervisors with facts, not readily available in other sources, necessary to an intelligent performance of their duties.[4]

If, while monitoring the electrical system the system supervisor is alerted to a problem, he has responsibility to direct appropriate action to remedy the problem. That remedy may entail the efforts of substation operators and/or those of repair crews. There are two Shutdown Prearrangement Coordinators assigned to the Detroit office, their functions are performed in the district offices by the District System Supervisors. Shutdown Prearrangement Coordinators plan and coordinate the procedures and sequences of maintaining and revising the electrical system. Requests for repair work and equipment replacement are directed to the coordinators. They plan the work so that alternate power lines and cables will carry the electrical loads to customers while repairs and replacements are effected. The coordinators must protect both the safety of field personnel and the continuous supply of power to customers.

Section 2(11) of the Act defines "supervisor" in terms of the existence of a number of enumerated powers and the nature of the exercise of those powers:

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

3. Id. at 167.

4. Id. at 206.

The First Circuit noted in *N.L.R.B. v. Metropolitan Petroleum Company of Massachusetts*, 506 F.2d 616, 618 (1st Cir. 1974):

"It is well settled that '§ 2(11) is to be read in the disjunctive, with the existence of any one of the statutory powers, regardless of the frequency of its exercise, being sufficient to confer supervisory status upon the employee.' "

*Accord, N.L.R.B. v. The Broyhill Co.*, 514 F.2d 655, 658 (8th Cir. 1975); *Arizona Public Service Company v. N.L.R.B.*, 453 F.2d 228, 230 (9th Cir. 1971); *Pacific Intermountain Express Co. v. N.L.R.B.*, 412 F.2d 1, 3 (10th Cir. 1969).

In concluding that the system supervisors were nonsupervisory personnel the Board followed its decision in *Arizona Public Service Co.*, 182 N.L.R.B. 505, 188 N.L.R.B. 1, *enforcement denied, Arizona Public Service Co. v. N.L.R.B.*, 453 F.2d 228 (9th Cir. 1971). *Arizona Public Service Co*, involved System Load Supervisors employed by an electric power company whose duties were virtually identical to those of the system supervisors involved in the instant case. The Ninth Circuit, in declining to enforce the Board's bargaining order, emphasized that "the Supervisors and Assistant Supervisors responsibly direct employees in the field after business hours and during emergencies." 453 F.2d at 231. The Court pointed to the activities of a System Load Supervisor during a Friday evening summer electrical storm:

While directing the ordinary repair operations and giving clearance for de-energized lines, testing faulty lines, and locating defects, the Supervisor, ignoring the chain of command, himself directed the vast operations necessary to return service to customers during a summer electrical storm. 453 F.2d at 232.

In the instant case the Regional Director acknowledged that system supervisors give directions to field personnel but concluded that

"[a]ny directions that the central system supervisors give to field personnel, who are directly supervised by individuals on the job sites are curcumscribed by pre-established operating procedures concerning the performance of certain mechanical functions." [5]

The Regional Director also concluded that Senior System Supervisors, District System Supervisors and Shutdown Prearrangement Coordinators lacked discretion in decision-making because of promulgated company directives and guidelines. The Regional Director thus determined that system supervisors did not exercise "independent judgment" for purposes of § 2(11). The Board determined that the Company committed unfair labor practices by refusing to bargain with the Union following its certification. The Board refused to reconsider the Regional Director's findings and conclusions as to the nonsupervisory status of system supervisors.

As the First Circuit stated in *N.L.R.B. v. Metropolitan Petroleum Company of Massachusetts, supra* at 618:

"We acknowledge that a reviewing court to a large measure will defer to the informed discretion of the Board on the question of supervisory status."

*Accord, GAF Corp. v. N.L.R.B.*, 524 F.2d 492, 494 (5th Cir. 1975); *N.L.R.B. v. Broyhill Co.*, 514 F.2d 655, 658 (8th Cir. 1975).

While it is not our role to second-guess the Board, we are obligated "to determine whether the NLRB's conclusions are supported by substantial evidence on the record considered as a whole, and whether its application of the statutory definition of supervisor had a reasonable basis in law [footnotes omitted]." *GAF Corp. v. N.L. R.B., supra* at 495. *Accord, N.L.R.B. v. Broyhill Co., supra* at 658. *N.L.R.B. v. Metropolitan Petroleum of Massachusetts, supra* at 618–619. *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Board, in its brief to the Court, makes two arguments in support of its determination. The Board first contends that the record supports the conclusion that sys-

**5.** Id. at 7.

tem supervisors "request" rather than "direct" field employees. The Board also argues that whether the instructions given by system supervisors are requests or directions, those instructions must be consistent with pre-established operating procedures and therefore system supervisors do not exercise the "independent judgment" required by § 2(11).

The Board's first argument has two parts. In addition to the "request"–"direction" distinction, the Board urges that system supervisors are not "supervisors" because they lack the power to directly discipline employees who do not comply with their "requests." The only evidence before the Administrative Law Judge which went to the question of whether system supervisors direct the actions of field personnel was testimony given by Company witnesses Eugene G. Allyn, the Chief System Supervisor, and by Robert V. Nicolson, General Superintendent of the Electrical System Department. Allyn, a Company employee since 1936, testified that in his tenure with the Company he could only remember one instance of a field employee refusing to obey directions given by a system supervisor.[6] On cross-examination, Nicolson was asked if it was accurate to say that system supervisors "request" rather than "order" field employees to take certain actions. Nicolson answered "no."[7] Nicolson also testified that

> "the system supervisor can, in fact, take over any operator under system control that would ordinarily be under local control any time he sees the situation warrants it."[8]

The record reflects that system supervisors issue literally thousands of instructions to field personnel. The record contains discussion of only one instance over the span of many years where a field employee refused to follow such direction. This does not amount to substantial evidence that these instructions are only requests. The record further reflects that system supervisors issue many instructions directly to field personnel thereby fulfilling the § 2(11) definition of a "supervisor." Therefore we need not reach the question of whether system supervisors lack the power to directly discipline employees.

The Board also contends that there is support of record for the Regional Director's conclusions that directions given by system supervisors to field personnel "are circumscribed by pre-established operating procedures concerning the performance of certain mechanical functions."[9]

The Board's argument is basically that system supervisors must comply with such operating procedures and therefore do not exercise the "independent judgment" required by § 2(11). A review of the record yields no evidence which indicates that pre-established operating procedures exist for every possible contingency which the system supervisor may face. A number of specific potential situations are covered by some form of written instructions. We find no evidence of record to the effect that even these specific instructions cannot be departed from when the system supervisor by the exercise of independent judgment concludes that another course of action is appropriate. We find extensive evidence of record that system supervisors *can* depart from both written and unwritten standard procedures. Employer's Exhibit 17, the introductory statement to the System Supervisory Division Handbook, states that recommended procedures "may be departed from, when, in the judgment of the Supervisor, the situation necessitates such action." Eugene G. Allyn, the Chief System Supervisor, testified that Employer's Exhibit 17 accurately reflected the discretion vested in system supervisors.[10] Robert V. Nicolson, the General Superintendent of the Electrical System Department, testified to the discretionary nature of the position of system supervisor:

---

**6.** Joint Appendix, Vol. II, at 556.

**7.** Id. at 385.

**8.** Id. at 377–378.

**9.** Joint Appendix, Vol. I, at 7.

**10.** Joint Appendix, Vol. II, at 683.

Many situations arise, both of an emergency nature and more routinely, of a routine nature, where a decision has to be made among several alternatives or several courses of action. They have the discretion and responsibility, in fact, to weigh these various alternatives, determine the best course of action, initiate the orders to the various operating personnel in the field to carry out these orders, and then finally to see that the orders are, in fact, duly discharged and carried out.[11]

The Board also notes that system supervisors must consult with the Chief System Supervisor or other Company officials in emergencies. The inference which the Board would have the Court draw from such consultation is that the consulted official decides the appropriate course of action thereby constraining any discretion which might otherwise be vested in the system supervisor. The Board points to two portions of the record as supporting its position. The first portion is a part of the testimony of Mr. Nicolson, discussing a Company memorandum directing system supervisors to check with superiors before dealing with failures of 120KV cables. Nicolson described such failures as "extremely rare" and testified that to his knowledge such checking had never taken place.[12] John S. Meil, a Senior System Supervisor, testified that there are a number of emergency situations,[13] in which superiors are supposed to be called. Meil, a Union witness, was asked on direct examination:

"Are there certain set-down rules as to when you should call a [superior] and when you should not?"

Meil answered:

"Yes, there are situations where they want to be *notified* and they are written in our on-call book." [Emphasis added.][14]

These two portions of the record do not provide substantial support for the proposition that any discretion normally exercised by system supervisors is removed in emergency situations by "notifying" supervisors. The testimony relied upon by the Board establishes only that the Company, like almost every business, has an established hierarchical structure. It would likely be standard procedure in most businesses for lower level supervisory personnel to keep superiors informed during emergency situations. The record contains no evidence to support the conclusion that the job of the system supervisor is taken over by higher Company officials during the emergency situations enumerated by Mr. Meil.

The duties of system supervisors (i.e. Senior System Supervisors, Central System Supervisors and District System Supervisors) satisfy the statutory test for "supervisors" in that the system supervisors have the "responsibility to direct [other employees]" and "such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11) (1970). We thus decline to enforce the Board's order as it applies to Senior System Supervisors, Central System Supervisors, and District System Supervisors.

The Shutdown Prearrangement Coordinators and a technical assistant in their office perform tasks somewhat different from those performed by system supervisors and for that reason we separately consider the Board's determination that they were nonsupervisory personnel. The Regional Director noted that the coordinators plan and coordinate the maintenance and revision of the electrical system. He went

---

11. Id. at 355.

12. Id. at 471.

13. Meil listed from memory the following "emergency" situations:

"Some of the situations would be the interruption of a distribution circuit for one hour or more, or where we have one wire down called a single-phase operation of a distribution circuit, or a total interruption of the substation, or an electrocution or accident to an employee, or an electrocution of anyone. These are some of the situations which might develop into a serious situation." Joint Appendix, Vol. II, at 643.

14. Id. at 643.

on to find that the coordinators "are bound by the advice of the operations department in making their shutdown arrangements." [15] The Regional Director concluded that:

> Although the shutdown prearrangement coordinators have an obligation to schedule work by the most economical means, including the avoidance of overtime, the record clearly demonstrates that throughout such decision making process these shutdown prearrangement coordinators are operating within and are delimited by clearly defined Employer policies. There is no indication that the shutdown prearrangement coordinators formulate and independently effectuate management policy; nor is there any evidence to establish that the shutdown prearrangement coordinators have authority to pledge the Employer's credit.[16]

The Regional Director further concluded "that the technical assistant performs essentially the same work tasks, although entailing less complex facets, as those done by the shutdown prearrangement coordinators." [17]

A review of the record demonstrates that there is substantial support for the Board's determination that the work of the Shutdown Prearrangement Coordinators is guided in large measure by pre-established operating procedures. Union Exhibit 10, a four-page memorandum dated April 3, 1972, and circulated over the signatures of Paul A. Duker, Vice President and Manager of Marketing, and Edward Hines, Manager of Operations, sets out Company policies dealing with shutdown of lines and equipment for maintenance and repairs. The Company argues that despite the memorandum coordinators have discretion to schedule shutdown at times they deem appropriate. The Company contends that the coordinator has the discretion to decide whether a shutdown can be safely scheduled on the day requested or whether it must be deferred until a more appropriate time.

The shutdown memorandum thoroughly covers the subject and leaves little or no room for the exercise of independent judgment. The memorandum opens with a general statement of procedure to be followed in normal shutdown situations:

> In general, the shutdown of lines and equipment for routine maintenance, changeout of equipment, line cutovers, etc., will be scheduled during normal working hours. Exceptions will be made when it is necessary to maintain acceptable service voltage, reasonable loading of remaining equipment, and service of a critical nature to certain individual customers. In addition, during shutdowns where a single contingency failure would result in a serious outage of long duration, work should be continuous until completed.[18]

If the terms "acceptable service voltage" and "reasonable loading" were undefined in the memorandum the coordinators might very well have the discretion which the Company argues they possess. However, these terms are clearly defined:

> Voltages to customers involved must be maintained within acceptable limits. These limits are from a drop of five percent below normal to a rise of two and one-half percent above normal.[19]

> The reasonable loading for cables is defined as halfway between the normal day-to-day rating and the emergency rating. The reasonable loading of all other substation equipment is defined as 90 percent of the one-day emergency rating with no auxiliary cooling.[20]

The work of the coordinator in emergency situations is also well-defined by the memorandum.[21]

---

15. Joint Appendix, Vol. I, at 9.

16. Id. at 10.

17. Id. at 11.

18. Id. at 233.

19. Id.

20. Id. at 234.

21. Id. at 235:
   *Emergency Repairs to Lines and Equipment Out of Service*
   Repairs are to be made without delay to Detroit Edison or Customer lines or equipment when any customer is out of service or

Also, it appears that repairs which will necessitate overtime by repair personnel must frequently be approved by the Marketing Department.[22]

There is substantial evidence of record to support the Board's determination that the Shutdown Prearrangement Coordinators and the Technical Assistant do not exercise independent judgment in performing their duties.

The petition of the Board for enforcement of its order is denied as to Senior System Supervisors, Central System Supervisors, and District System Supervisors but granted as to Shutdown Prearrangement Coordinators and the Technical Assistant.

## MODIFYING ORDER

The National Labor Relations Board moves this Court to modify its June 25, 1976 decision, to the extent that the decision provided for enforcement of the Board's order, and to remand the case to the Board for determination as to whether the enforcement order is appropriate as to the two Shutdown Prearrangement Coordinators and the Technical Assistant. The Board contends that the extent of the change in the unit's composition raises a question as to the continued appropriateness of the unit for purposes of collective bargaining.

Respondent Detroit Edison Company concurs in the Motion to Modify.

Upon due consideration this Court's decision of June 25, 1976, is hereby modified to the extent that the case is remanded to the

Board for a determination as to the appropriateness of the unit for collective bargaining purposes dealing with the Shutdown Prearrangement Coordinators and Technical Assistants.

when any customer load is restricted because of the failure.

Repairs, including fault location, will be delayed until the next normal working day and completed during normal working hours only if all of the following conditions are met:

1. Voltage to customers involved can be maintained within accepted limits. These limits are from a drop of five percent below normal to a rise of two and one-half percent above normal.

2. Equipment remaining in service will not be loaded beyond a reasonable value. The reasonable loading for cables is defined as halfway between the normal day-to-day rating and the emergency rating. The reasonable loading of all other substation equipment is defined as 90 percent of the one-day rating with no auxiliary cooling.

3. No storms that would adversely affect the remaining service are forecasted throughout the period required to complete the repairs.

4. Failure of the remaining service to any customer, that is, a second contingency failure, will not cause extensive property damage, jeopardize the safety of any number of persons, or result in an outage exceeding approximately 80 MVA–hours.

**22.** Id. at 236.