**EXXON PIPELINE COMPANY, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 78–3197

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

June 11, 1979.

---

* Rule 18, 5th Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5th Cir., 1970, 431 F.2d 409, Part I.

Jill S. Ferrel, Law Dept., Houston, Tex., for petitioner, cross-respondent.

Elliott Moore, Deputy Associate, Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Act. Assoc. Gen. Counsel, Allison W. Brown, Jr., Kathy L. Krieger, Attys., N. L. R. B., Washington, D. C., for respondent, cross-petitioner.

Louis V. Baldovin, Jr., Regional Director, N. L. R. B., Houston, Tex., for other interested party.

Before CLARK, GEE and HILL, Circuit Judges.

PER CURIAM:

Exxon Pipeline Company challenges a determination by the National Labor Relations Board in a representation proceeding that the company's "oil movement supervisors" (OMS's), formerly "dispatchers," be classified as employees in a proper collective bargaining unit rather than as unprotected supervisors. The Board cross-applies for enforcement of its subsequent order requiring the company to cease refusing to bargain with the union duly elected by the employees in question. Finding much evidence in the record to support the Board's characterization, we enforce its order.

Exxon Pipeline's business is the operation of about 13,000 miles of pipeline in seven states as a common carrier of petroleum. It has about 450 employees in the field keeping the pipe in good repair and monitoring the flow of petroleum in certain areas of the pipeline. The rest of the pipeline, about 8,000 miles, is monitored at the company's office in downtown Houston by the oil movements supervisors. These men, operating around the clock in three daily shifts, sit at computer-assisted consoles that show the progress of the various batches of oil as they flow through the pipes according to the schedules prepared by others at the Houston office. The OMS personnel have highly responsible positions: they physically operate the system by remote control to ensure that each batch goes through the proper pipes to the correct destination; they are charged with detecting breakdowns and other "upsets" as they show up on the control panel and with reacting appropriately to minimize loss of oil and to effect the scheduled deliveries. But it is not responsibility per se or exercise of discretion or independent judgment in themselves that signify under section 2(11)[1] of the National Labor Relations Act. Rather, responsibility for directing other *employees* is the critical factor in characterizing someone as a supervisor. *N. L. R. B. v. Security Guard Service, Inc.,* 384 F.2d 143 (5th Cir. 1967); *N. L. R. B. v. Brown & Sharpe Manufacturing Co.,* 169 F.2d 331, 334 (1st Cir. 1948).

---

1. Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), defines "supervisor" as

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The company does not contend that the OMS's have authority to hire, fire or discipline other employees. It argues solely that OMS personnel "responsib[ly] direct" others in the company.

The company asserts that OMS personnel have authority "responsib[ly] to direct" other employees because when they discover an upset in a monitored pipeline the OMS on duty has the authority to deploy the field personnel near the site to correct the problem. The OMS, the company argues, makes an independent judgment whether a problem must be corrected immediately, even to the extent that field employees must work overtime, or whether a problem is minor and may be attended to later. The record amply demonstrates, however, that the OMS does little more than notify the field that a certain problem has occurred and request assistance in remedying it. He has no further authority or responsibility to direct the field personnel in the manner of performing their remedial duties. The field personnel are in a wholly separate department of the company and thus function in a different supervisory hierarchy from that of the OMS. The OMS must call on field personnel in a particular sequence required by the lists promulgated for each field division and thus may not usually call on a "wage employee" until he has unsuccessfully attempted to locate the local supervisor. Since it is the "joint mission and objective" of the two parallel departments to move oil through the system, the field employees and their supervisors probably have prior independent authorization to do whatever is necessary in the event of a serious upset, even if overtime results. In addition, there was testimony that someone from the field department participates equally with the OMS in reaching a joint decision as to·whether and when a repair will be effected.

These circumstances persuasively distinguish this case from those relied on by Exxon Pipeline. In *Arizona Public Service Co. v. N. L. R. B.*, 453 F.2d 228, 231–32 (9th Cir. 1971), for instance, the systems supervisors had the power to "choose which linemen are to work, when and where." The supervisors there, in great contrast to OMS personnel here, had "clear delegated authority over virtually everybody in the company." *Id.* In *N. L. R. B. v. Detroit Edison*, 537 F.2d 239, 241, 243 (6th Cir. 1976),

the supervisors in question issued "literally thousands of instructions" to field personnel. The reviewing court concluded that the instructions, though couched in terms of request, amounted to orders derived from the supervisors' independent judgment. Having no access to the record in that case, we cannot observe the character of those instructions for ourselves. Our careful review of the record herein convinces us that the requests issued by OMS personnel do not amount to supervisory direction of the type required. The OMS's do not "direct appropriate action to remedy the problem," nor can they "take over any operator under system control that would ordinarily be under local control" any time they see fit. *Id.* Once notified of a suspected problem, the field personnel here are left to their own devices and chain of command in doing what the situation requires. There is, of course, close communication between the two bases of operation so that the OMS will shut down pipelines or pumps as needed and will not restart the system precipitously. But as regards the field employees, the OMS is little more than a night watchman, who can hardly be said to supervise the police when he calls to report and request investigation of the burglary he has just discovered. Accordingly, the order of the Board is hereby ENFORCED.