**SOUTHERN INDIANA GAS AND ELECTRIC CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1733.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1980.

Decided Aug. 10, 1981.

---

Fred P. Bamberger, Evansville, Ind., for petitioner.

Charles A. Werner, St. Louis, Mo., Susan L. Williams, NLRB, Washington, D. C., for respondent.

Before PELL and BAUER, Circuit Judges, and WILL,* Senior District Judge.

PELL, Circuit Judge.

Southern Indiana Gas and Electric Company (Company) has petitioned this court pursuant to 29 U.S.C. § 160(f) to set aside a final order[1] of the National Labor Relations Board (Board) which found that the Company violated Sections 8(a)(1) and (5) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1), (5).

The Company has recognized the International Brotherhood of Electrical Workers, Local Union 702, AFL–CIO, (Union) as the exclusive bargaining representative of its production and maintenance employees. The Union, seeking also to represent the Company's five Power Control Center's "System Supervisors" (system supervisors), petitioned the Board to direct an election among these employees. The Company opposed the election contending that these employees were (1) "supervisors" exempt from the Act's coverage under 29 U.S.C. § 152(11), and/or (2) managerial employees traditionally omitted from the Act's coverage by the Board, see NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). A Regional Director of the Board held an evidentiary hearing, concluded that these employees were not supervisory or managerial personnel, and directed an election.[2] The Union prevailed

* Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The Board's Decision and Order, reported at 249 NLRB 252 (1980), is based upon findings made by the Regional Director in the underlying representation proceedings, Case No. 25–RC–7256.

2. The Regional Director ordered the system supervisors to be placed within the existing production and maintenance bargaining unit

and was certified as the system supervisors' exclusive bargaining representative.

The Company refused to bargain with respect to these employees. The Union thereupon filed an unfair labor practice charge on October 29, 1979. The Board's Regional Director issued a complaint and the General Counsel moved for summary judgment which the Board granted. The Board found the Company in violation of Sections 8(a)(1) and (5)[3] of the NLRA and ordered it to bargain with the Union regarding the system supervisors.

The Company continued to refuse to bargain and filed this petition to review and set aside the Board's order. The Board has cross-applied for enforcement pursuant to 29 U.S.C. § 160(e).

## The Company's Operations

The Company provides electrical utility service[4] to residential, industrial, and commercial customers over a 751-mile network of high voltage lines in an eight-county area around Vanderburgh County, Indiana. The Company operates a total of seventeen generating units eight of which are dual-fueled with oil and gas, eight are coal-fired, while the remaining unit operates on natural gas. Four of the generating units at the Warwick Generating Complex are jointly owned by the Company and the Aluminum Company of America Generating Company (Alcoa). The Company interconnects with six other utilities at seven interchange points which enables the Company to buy or sell power with these utilities.

The Power Control Center (Center), located apart from the Company's other facilities, monitors the generation and transmission of power for the entire system to ensure the supply of a safe and reliable energy source in the most economical manner. The Center, which operates 24 hours per day, seven days a week, is staffed by the Chief system supervisor, Claude Hunt, five system supervisors, and one clerk. Hunt works the daytime shift and is present during five of the twenty-one weekly shifts. At other times the system supervisors work alone although they generally can get in touch with Hunt, James Van Meter, the Director of Power Production and Procurement, or Norman Wagner, the Vice-President of Operations, if problems arise.

## The Role of the System Supervisors

System Supervisors monitor the entire system through electronic measuring devices which enable them to supervise the production and transmission of power, the receipt of purchased power, and the distribution of sold power. They prepare load forecasts daily to predict the amount of power necessary to maintain the system. Factors such as temperature forecasts, customers' additional power requests, and the estimated capability of each generating unit are considered. Because these plans are only predictions, they are subject to frequent modification by system supervisors to adjust to actual capability and load requirements. Actual need may differ from projected need due to changes within the system such as the loss of equipment or interchanges, or due to unanticipated power demand.

If a power shortage develops, system supervisors can exercise a variety of options. They may direct control operators at any of the various generating plants to increase production, and can even start up the more expensive gas-operated turbine if necessary.[5] If no generation is available, the

---

should they vote in favor of Union representation.

3. 29 U.S.C. § 158 provides, in part, that
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

4. Although the Company also produces and distributes gas, the parties have stipulated that only electrical operations are relevant here because the system supervisors have no connection with the gas operations.

5. Because the cost of operating the gas turbine is higher, a decision to implement its use is

supervisors have authority to instruct Alcoa to curtail added power use from the jointly owned plant. These lines remain down until system supervisors authorize Alcoa to bring them back up. Finally, supervisors may decide to purchase power from other utilities. They can commit the Company financially on an instantaneous basis. When purchasing emergency power, system supervisors rarely have time to contact their superiors. Likewise, if the system's generation exceeds present demand for current, the supervisors must curtail generation or sell the excess power.

Naturally, Hunt and his superiors have input into major decisions resulting from the modification of a load forecast when they are available. The system supervisors, however, frequently operate the Center alone. Time pressures can prohibit them from clearing their decisions with their superiors. James Van Meter testified at a Board hearing regarding the authority possessed by system supervisors:

Q: ... Do they [system supervisors] have the right to modify or alter that plan [load forecast] during the course of the day depending upon what the realities of the loads are?

A: I would venture to say that there are very few days that go by that the plan isn't altered, and that's true not only of the day shift, but also of the night shift where the supervisors are alone. There are some modifications that must be made to every plant [sic] due to unforeseen circumstances that come up as a result of generating or buying electricity.

Q: And that can occur at any time during any of the shifts?

A: That can occur at any time.

Q: Do they supervise that judgment independently of any orders?

A: They have the right and responsibility to exercise that independently of anything to protect our system.

Beyond power generation and procurement, the system supervisors are also responsible for power transmission. They regulate power flow throughout the system by remote control of transmission substations. System supervisors also oversee maintenance and repair work. They possess the sole authority to order a piece of equipment to be taken out of service or to prohibit its removal. Such a decision requires a detailed consideration of factors such as the overall condition of the system and the likelihood that any particular order may overload other lines. Repair work requires switching which is the diversion and rerouting of power to isolate the line or equipment requiring repair.

Ordinary switching necessitates the preparation of a switching schedule detailing instructions to be carried out by field personnel. These schedules are prepared by the Chief system supervisor or by system supervisors. In nonemergency situations, every schedule prepared by a system supervisor is checked by a second system supervisor or by the Chief supervisor, and by the field operations personnel who requested the repairs. Field supervisors dispatch crews to affected sites. When the crew is positioned in the field and ready to accept orders from the system supervisor at the Center, a field employee talks to a system supervisor by mobile radio. Field employ-

---

considered a major decision. It is true, as the Board points out, that approval by or notification of Hunt or one of his superiors is generally desirable when a system supervisor makes this decision. The Board, however, would have us believe that the supervisors cannot implement such a decision under any circumstances without prior approval. The testimony of James Van Meter, the Director of Power Production and Procurement, belies that representation:

Q: Now, with respect to putting on the gas turbine and taking it off, isn't it correct that *most of the time* the system supervisor must contact the chief, yourself, or Mr. Wag-

ner in order to do that *except in an emergency*, to protect the system?

A: ... [J]ust like any major decision that any of us make due to the cost of that, he reviews that with Mr. Hunt, who will inform me definitely about our need for this. But, that would be no different than me making the decision. I would certainly inform Mr. Wagner of that decision, too.

(Emphasis added.) As discussed hereinafter, the chain of command is always subject to subversion in the event of an emergency, particularly when superiors are not available.

ees generally have copies of the switching schedules to assist them in following the system supervisor's radioed instructions.

System supervisors also prepare switching schedules in emergency situations which might occur due to a storm or accident. Unless the emergency occurs during the daytime shift, these schedules usually are not reviewed by anyone. In an emergency situation, the field personnel dispatched to the site have no copies of the switching schedule. The system supervisors are totally responsible to direct people in the field. They radio step-by-step instructions to the field employees, direct them to remain where they are, or instruct them to move to another location. Although system supervisors do not themselves reprimand field personnel, they do report misconduct.

Other duties of the system supervisors include recording data, preparing reports required by the Federal Power Commission and other agencies, and maintaining a written log of problems that arise.

At the hearing, one system supervisor denied ever being invited to management meetings.[6] Van Meter, however, testified that system supervisors are invited to some management meetings and training sessions. He stated that attendance is mandatory, but was unsure whether all of the supervisors actually did attend or whether any disciplinary action was taken against those who failed to attend.

*Standard of Review*

■■■ The Board is accorded substantial discretion when determining whether an employee is exempt from the Act due to managerial status, *see NLRB v. Yeshiva Univ.*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980), or supervisory rank, *American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 894 (7th Cir. 1981). Conse-

quently, Board findings will be upheld as long as they are supported by substantial evidence. *See, e. g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *American Diversified Foods, Inc., supra.* The substantial evidence standard requires this court to review the entire record, including that evidence which detracts from the Board's decision, even though evidence supporting the Board's conclusions, viewed by itself, might seem "substantial." If the record, considered in its entirety, "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence," the Board's decision must be set aside. *Universal Camera*, 340 U.S. at 490, 71 S.Ct. at 466, quoted in *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir. 1977).

*Supervisory Status*

■■■ Supervisors are excluded from the Act's coverage by 29 U.S.C. § 152(3). Section 152(11) defines a supervisor as

... any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

We find the Board's conclusion that system supervisors are not supervisors within the meaning of the statute unsupported by substantial evidence.[7] Upon a review of the

---

**6.** This same supervisor admitted that he had made reservations to attend the last annual management dinner meeting (a "state of the company" address) but was unable to attend for personal reasons.

**7.** The Company's alternate contention, that the managerial exemption from the Act applies in this case, rests largely on the system supervisors' ability to bind the Company financially

without prior approval in emergencies. While the court in *Arizona Public Service Co. v. NLRB*, 453 F.2d 228, 233 n.10 (9th Cir. 1971), considered such power to be an indicator of *supervisory* status, the Board treated such authority as evidence of *managerial* status in *Central Maine Power Co.*, 151 NLRB 42, 44–46 (1965). Electrical utility employees whose pur-

entire record, we are convinced that these supervisors possess the authority responsibly to direct other employees. Because § 152(11) must be read in the disjunctive, supervisory status is proven if the evidence establishes the presence of any one of the criteria listed.[8] *See, e. g., American Diversified Foods, supra,* 640 F.2d at 896; *Adam & Eve Cosmetics, supra,* 567 F.2d at 727.

The Board concluded that system supervisors were not supervisors in the statutory sense for several reasons. It noted, for example, that the supervisors are located in facilities separate from, and function within a different employment hierarchy than, the generating station operators or the switching personnel whom they allegedly direct. It is true that the Power Control Center staff, generating station personnel, and repair crews do operate independently of one another to the extent that each is separately housed and each has its own immediate chain of command. It is also true, as the Board indicates, that system supervisors do not assign particular employees to perform switching operations. Rather, they contact a foreman in the field who assigns individuals to report to the locations specified by the system supervisors. The Board further emphasizes the fact that while supervisors can design switching schedules which require overtime, they cannot designate the particular employee who will perform the overtime work. In its brief on appeal, the Board characterizes contacts between system supervisors and other employees as mere cooperative endeavors in which system supervisors routinely impart technical expertise to other employees in the form of requests, not orders.

These factors alone, however, will not deprive the employees of supervisory status if the record as a whole indicates that they do responsibly direct other employees. Upon strikingly similar facts, the Ninth Circuit in *Arizona Public Service Co. v. NLRB,* 453 F.2d 228 (9th Cir. 1971), ruled that an electrical utility's employees, whose duties and responsibilities were analogous to those of the system supervisors in the case at bar, were in fact statutory supervisors. That court rejected many of the arguments advanced here by reasoning that "[t]he effective exercise of authority is nonetheless supervisory though it is passed on through another supervisory employee. Nor is it less supervisory power because it is couched in non-demanding terms." *Id.* at 233 (citation and footnote omitted). *See Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347, 362 (1st Cir. 1980). System supervisors do direct other employees. Van Meter testified that they give instructions to generating operators to increase or decrease power. System supervisor Cook testified that he had the responsibility to direct individual switchmen in the field. The system supervisor's job description stipulates that they have "the authority to direct crews to assure safe and adequate power production." The fact that system supervisors do not exercise complete authority over these employees does not mean that they do not direct them. Nor does the cooperative spirit in which the work is performed deprive the supervisors of supervisory status.

The Board further contends that to the extent the system supervisors do direct other employees, their instructions are nonetheless routine and require little discretion or independent judgment. The Board

chases have been deemed "routine," however, have not been accorded managerial status. *Westinghouse Electric Corp. v. NLRB,* 424 F.2d 1151, 1158 (7th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); *Connecticut Light and Power Co.,* 121 NLRB 768, 770 (1958). We recognize that system supervisors' authority independently to commit the Company's credit in this case quite possibly exceeds that previously considered "routine." We need not decide, however, whether this purchasing function would establish an independent basis for exemption from the Act as either a supervi-

sory or managerial responsibility because we find system supervisors' directions to field employees sufficient to establish supervisory status.

8. Although the Company does not allege that system supervisors discipline field employees, evidence established that they do report misconduct to field supervisors. However, we do not decide whether system supervisors thereby possessed the power "effectively to recommend" discipline.

found, for example, that "with regard to the switching operation, ... there's no showing that would support an inference that there is a large significant discretion available to the system supervisors in the manner in which they divert live current from areas to be worked on by production and maintenance employees." Section 152(11) does condition the supervisory exemption upon the exercise of one of the enumerated duties in a nonroutine manner and explicitly "requires the use of independent judgment." *See, e. g., Adam & Eve Cosmetics, supra,* 567 F.2d at 727; *Westinghouse Electric Corp. v. NLRB,* 424 F.2d 1151, 1156 (7th Cir. 1970). We find the Board's conclusion that this condition was not satisfied, however, to be unsupported by the record.

The Board virtually ignored the scope of the system supervisors' authority in emergency situations. If an emergency arises which requires switching during Hunt's absence, a system supervisor must design an emergency schedule and, as with routine switching, give field employees step-by-step instructions by radio. In emergencies, field employees do not possess a copy of the switching instructions and therefore are totally dependent upon the system supervisors to guide them safely through their work, and to release them when the task is completed. As James Gordon, Director of Electric Operations, testified:

> Under emergency switching procedures, the responsibility is up to the system supervisor to totally direct people in the field, to get equipment out of service. Under emergencies, a line fault, if that line has to be broken down and sectionalized, it's his responsibility to direct people to the location where the work needs to be done.
>
> He also quite often does call a district manager and ask him to assign so many people that can perform the switching under his direction.

While the Board emphasizes that switching schedules are usually double-checked, it disregards the fact that schedules generally are *not* checked by anyone in emergency situations unless the emergency occurs during the day shift when Hunt is present.

Although the record does reveal one occasion when Hunt reported in during an emergency when he was not on shift, this does not undermine the supervisor's authority to act wholly without guidance when a superior is not available. The Company's position description, for example, states that:

> The major challenge to this position is the ability to handle effectively necessary spontaneous action and decisions required in emergencies. The incumbent works within the framework of Company policies and practices. He must have approval for power transmitting but can take measures necessary to assure power supply and protect system in time of emergency or absence of Supervisor, Chief System.

Gordon testified that "[o]n an emergency basis, [the system supervisor] has to be knowledgeable enough to be able to sit down and make up a [switching] schedule on pretty short notice. He is there by himself, so he has to make those decisions." The system supervisors here are like those in *Arizona Public Service, supra,* 453 F.2d at 232, who were held to be "more than simple supervisors of machines. They effectively direct field operations during emergencies and after hours."

■ The Board minimizes the system supervisors' role in emergencies, presumably because emergencies are infrequent. Yet, it is well settled that it is the existence of supervisory authority, not the frequency of its use, which determines supervisory status under § 152(11). *American Diversified Foods, supra,* 640 F.2d at 896; *Arizona Public Service, supra,* 453 F.2d at 230; *Oil, Chemical and Atomic Workers Int'l Union v. NLRB,* 445 F.2d 237, 244 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972); *Ohio Power Co. v. NLRB,* 176 F.2d 385, 388 (6th Cir.), *cert. denied,* 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949); *Graves Trucking, Inc.,* 246 N.L.R.B. No. 52 (1979).

The Union, as intervenor-respondent, contends that system supervisors' discretion in switching operations is severely limited by the existence of switching guidelines. Gordon, however, testified that existing guidelines ensure "that the proper paperwork is done, the proper people are informed and that someone does not get out of line," but that "the actual step-by-step procedures are determined by the system supervisor based on his knowledge of the system. . . ." Although some routine switching schedules are additionally available, there was no evidence to indicate that they cover every potential contingency or that they are actually used by the supervisors. Each switching situation is unique and each switching schedule "will vary with whatever line section or piece of equipment that you want to get out of service," Gordon testified. In *NLRB v. Detroit Edison Co.*, 537 F.2d 239 (6th Cir. 1976), a factually similar case, the court rejected the argument advanced here. The court reasoned that while specific written instructions covered a number of situations confronted by the system supervisors in that case, there was no evidence to show either that those guidelines covered every possible situation which might arise, or that the employees could not depart from the instructions if they decided that another course of action was more advantageous. *See Maine Yankee, supra*, 624 F.2d at 362 ("[E]ven were we to assume that written guidelines could somewhere be found to cover virtually every eventuality, we do not think that this would demonstrate that independent judgment is not exercised."). We find the existence of written guidelines regarding switching operations insufficient to deprive the system supervisors of supervisory status.[9]

The employer buttresses its position by advancing the argument that unless the system supervisors are considered supervisors, the Company's electrical system is operated without any supervision during certain hours every day and in emergencies. The Board seeks to rebut this argument by pointing out that certain superiors generally are on-call, and that during one emergency Hunt returned to work. The Board ignores the fact that system supervisors are responsible for the complete operation of the Company's electrical system. The fact that they may consult with superiors in emergencies if time permits, or that they may advise superiors of actions taken, should not obscure the fact that they can do virtually anything necessary to protect the system. The record does not support the contention that system supervisors never take discretionary action without consulting superiors. Emergency switching schedules, for instance, are rarely reviewed by anyone unless the emergency occurs during the day shift. Purchases of emergency power can and do occur without prior approval.

The Company's expectation that supervisors will advise one of their superiors of decisions taken independently does not eliminate their authority to take independent action when necessary. As James Van Meter testified regarding the system supervisor's decision to start up the more expensive gas turbine:

[J]ust like any major decision that any of us make due to the cost of that, he reviews that with Mr. Hunt, who will inform me definitely about our need for this. But, that would be no different than me making the decision. I would certainly inform Mr. Wagner [Vice-President of Operations] of that decision, too.

\* \* \* \* \* \*

I want to say, that doesn't mean that [the system supervisor] doesn't make the deci-

---

9. As Company employees, the system supervisors are also necessarily circumscribed to some degree by the existence of general Company policy. The Company's job description for system supervisors, for example, states that these employees work within Company policies and practices, and that they should perform their duties with the goal of economy, efficiency, and safe power production. This very same docu-ment, however, authorizes the system supervisors to take whatever measures they deem necessary to assure power supply and to protect the system in emergencies. Moreover, it is axiomatic that all employees, including top management, work within the framework of Company policy and practices. All Company employees are, or should be, necessarily interested in producing power cheaply and safely.

sion, but it is passed on all the way through.

Neither the Company's expectation that system supervisors will inform a superior of actions taken in emergencies, nor the very infrequency of emergency situations, detracts from the supervisory status of these employees. *Maine Yankee, supra,* 624 F.2d at 364; *Detroit Edison, supra,* 537 F.2d at 244. Emergency decisions made by lower level supervisory personnel are eventually passed up through the management hierarchy in almost every business. *Detroit Edison, id.* There is no guarantee that a superior will be available for consultation after hours, or in every emergency, even assuming that time factors would permit such contact. Especially in light of this, if these employees are not supervisors, then the Company's entire electrical system operates without any supervision in the evenings, on weekends, and in emergencies. *Arizona Public Service, supra,* 453 F.2d at 231–32 n.7. *Cf. American Diversified Foods, supra,* 640 F.2d at 896 (fact that shift managers are generally highest ranking employees in store provided one indicator of supervisory status).

■ The Board's decision fails to mention the Company's own determination of the system supervisor's status. The Company has the right to define jobs within its own hierarchy and, therefore, to grant supervisory status to employees provided that the actual job duties reflect the designation.[10] The Company's designation of the position as supervisory, while not itself determinative, is certainly a significant factor in ascertaining employee status. *Maine Yankee,* 624 F.2d at 365; *Arizona Public Service,* 453 F.2d at 231. The job description in this case stipulates that system supervisors have authority to direct switching crews and to take unsupervised emergency measures when necessary. The description specifies that the "major challenge" of the job is "the ability to handle effectively necessary spontaneous actions and decisions required in emergencies." It also acknowledges that the employees' impact on purchasing and power control has an "unmeasurable" effect upon Company revenue and capital. The Board does not assert that the job description is a mere pretense by not fairly reflecting the actual duties of system supervisors. Thus, the Board should have accorded some weight to the job description. *Maine Yankee,* 624 F.2d at 364–65; *West Penn Power Co. v. NLRB,* 337 F.2d 993, 997–98 (3d Cir. 1964).

Finally, we acknowledge two minor factors which, aggregated with the evidence supporting supervisory status detailed above, buttress our determination that the Board's conclusion was not based upon substantial evidence. Initially, we note the contested state of the evidence regarding employee participation in management meetings. The Board found that system supervisors did not attend any management meetings. One witness, however, stated that system supervisors were in fact invited to some management meetings. The sole system supervisor who testified stated that he was never invited to management meetings. Yet he also testified, at another

10. In *Maine Yankee, supra,* 624 F.2d at 349 n.4, the First Circuit reasoned that the employer's designation of the employees as supervisory was a reasonable effort to exclusively identify them with the interests of the employer. The company's interest in allying those employees exclusively with management was compelling because the employees bore substantial responsibility which, if not conscientiously carried out, could result in an accident exposing the company to significant liability.

In the present case, the electric utility employer's potential liability in the event of a malfunction is not comparable to that of the nuclear facility in *Maine Yankee.* Nonetheless, the principle is applicable. In each case, the employees possess the potential to assert a significant economic impact on the employer. A system supervisor's failure to make the most advantageous decision could, for example, result in a power blackout or in higher energy production costs due to the unnecessary use of an expensive source of power. System supervisors also possess the authority to commit the Company financially on an instantaneous basis when buying power from interconnected utilities. Given these potential economic impacts, it is not unreasonable for the Company to designate the system supervisor's position as supervisory since the Company certainly has an interest in ensuring that the system supervisors are exclusively identified with management.

point, that he had in fact made a reservation for the annual management meeting dinner, but failed to attend for personal reasons. *See* note 6, *supra,* and accompanying text. While seizing upon the supervisor's denial that he never attended management meetings, the Board gave no weight to Company testimony that system supervisors were invited to meetings. In *Maine Yankee,* 624 F.2d at 365, however, the court cited the Company's *invitation* "to attend so-called management meetings" as one factor supporting supervisory status. The Board oversimplified the dispute in this case when it credited a portion of the contradictory testimony of the only system supervisor who testified [11] and disregarded the Company's testimony on the subject. Secondly, the Board failed to give any weight to the fact that system supervisors are salaried employees ineligible for overtime pay. Again, while this factor, standing alone, may not be overly significant, it does merit some weight when considered with the rest of the evidence supporting supervisory status. *Maine Yankee,* 624 F.2d at 365.

We consider *Maine Yankee, Detroit Edison,* and *Arizona Public Service,* to be controlling cases on the issue of supervisory status as applied to these facts. As the Board points out, these cases are not wholly identical factually. Nonetheless, we find the Board's attempts to distinguish them unpersuasive.

The Board contends that the system supervisors in *Arizona Public Service* possessed a substantially greater degree of independent authority than the employees in this case. The Board highlights the Ninth Circuit's determinations that the employees in *Arizona Public Service* chose which linemen would work, when, and where, and that the supervisors ignored the chain of command in an emergency. 453 F.2d at 232–33. By contrast, the Board argues, the employees in this case do not choose which individual will perform the work, they

merely coordinate switching operations, and they allegedly follow the chain of command even in emergencies. A thorough comparison of the cases indicates that these asserted distinctions reflect only semantic differences.

While we cannot review the record upon which the Ninth Circuit based its decision, we have examined the Board's findings in that case. The Board's Decision and Direction of Election, 182 N.L.R.B. 505 (1970),[12] indicates that the supervisors there worked within an overall framework virtually identical to that in the instant case. In that case, the Board found that the system supervisors "*[n]ormally* . . . dispatch crews of servicemen to trouble spots by orders issued to station managers · or foremen, although in remote areas or in emergency situations there may also be direct contact with crewmembers." *Id.* at 506 (emphasis added). Employees "may also direct generating plants to increase or decrease power generation. . . . This is ordinarily done by contacting station managers or foremen at such plants." *Id.* Furthermore, the Board in that case found that the system supervisors

> *normally* transmit their instructions to . . . [supervisors in the field], who in turn provide specific local supervision to field employees. . . . Direct contacts with field employees . . . appear to be limited and almost always by telephone, and even then often occur only after the field employees have been ordered by their immediate supervisors to communicate with the [system supervisors] in order to clarify general directions already received from them. Furthermore, orders given directly to field employees . . . are normally in the form of routine directives to perform certain known mechanical functions.

*Id.* (emphasis added).

The day-to-day operations in the case at bar are similar, and, if anything, reflect

---

11. Of the five system supervisors who voted in the election, four favored Union representation.

12. The Board's grant of summary judgment based upon these findings is reported at 188 N.L.R.B. 1 (1971).

greater independence and direction since the system supervisors here maintain communications with and direct switching personnel in the field even in routine situations.

Upon review, the Ninth Circuit in *Arizona Public Service* primarily focused upon the system supervisors' authority in emergency situations or after hours, a subject largely ignored by the Board. We find that the authority possessed by system supervisors in emergency situations in the instant case does not differ substantially from that exercised by the employees in *Arizona Public Service*. As detailed above, system supervisors can and do bypass the chain of command in emergencies when no superior is available for consultation, or when time simply does not permit the delay inherent in clearing an instantaneous decision with a superior. Similarly, in *Arizona Public Service*, the court noted that the employees discussed courses of action with their superiors when "there is no immediate threat to life or property and a superior is available. . . ." 453 F.2d at 232.

The Board advances a similar contention regarding the employees in *Detroit Edison*. In that case, the court found that the functions performed by the company's system supervisors were virtually identical to those performed by the system supervisors in *Arizona Public Service*, 537 F.2d at 242. The Board points out that in *Detroit Edison* the system supervisors issued "literally thousands of instructions to field personnel." *Id.* at 243. The Board, however, does not show that the situation in the instant case is any different. System supervisors here direct switching personnel in the field in every switching operation—routine and emergency. They also instruct generating operators to increase or decrease production. Although apparently no one has counted the precise number of such directives which have ever issued, the record implies that it is clearly a substantial number, surely approaching, and quite possibly surpassing, "literally thousands."

Second, the Board contends that employee responsibilities in *Detroit Edison* differed from those at hand because evidence in that case showed that system supervisors "take over" any operator who ordinarily would be controlled by a local supervisor anytime the situation warrants. 537 F.2d at 243. In the case at bar, system supervisors similarly "take over" switchmen in the field particularly in emergencies by guiding them through the switching operation, directing them to new locations when necessary, and releasing them when finished. That the system supervisors do not initially assign the particular individual who will perform the switching operation is immaterial. The supervisors nevertheless directly instruct the employee. Both routine and emergency switching schedules originate in the Power Control Center. Field supervisors dispatch the switchmen, but do not themselves formulate the switching procedure. Finally, contrary to the Board's assertion, higher officials do not always handle emergency situations. The record reflects only one instance in which the Chief system supervisor returned after hours during an emergency. The record also indicates that system supervisors possess authority to take independent actions when necessary to protect the system.

Finally, the Board distinguished *Maine Yankee* in oral argument by emphasizing that in that case the Shift Operating Supervisor (SOS) had authority to direct one other employee also stationed in the control room, and two others (by telephone) stationed elsewhere in the plant. The fact that the court found that the SOS directed both sets of employees indicates that presence of the employees subject to direction in the same immediate area as the supervisor is not required. The Board asserts that, in the case at bar, the employees do not report directly to the supervisors as was the case in *Maine Yankee*. Although the Board is correct, *Arizona Power* and *Detroit Edison* do illustrate that supervisors can responsibly direct other employees even when those employees routinely report to someone else.

The Board prefers to analogize the SOS in *Maine Yankee* to the Chief system super-

visor in this case. The comparison quickly disintegrates, however, because the Board concedes that a plant shift superintendent, the SOS's superior, was always present at the plant (though not always in the control room) on *every* shift, thus rendering the SOS the second ranking employee on every shift. 624 F.2d at 351, 352. Although at any given moment, the plant superintendent might have been traveling between parts of the plant and therefore momentarily beyond contact, the fact remained that the superintendent was always on the premises. This contrasts starkly with the situation in the instant case where the system supervisors operate wholly on their own in evenings and on weekends. Although superiors may be accessible by telephone, their absence from the plant necessarily renders them somewhat less accessible than a superior stationed within the very same plant. Yet the court in *Maine Yankee* found significance in the possible momentary inaccessibility of the plant superintendent because the evidence "established that in the event of an emergency, the SOS's clear responsibility includes the taking, on his own initiative, of the proper corrective measures where prior consultation with the plant shift superintendent is not possible." *Id.* at 363.

Cases cited by the Board in its brief on appeal which might arguably mandate a different result are inapposite. In *Exxon Pipeline Co. v. NLRB*, 596 F.2d 704, 706 (5th Cir. 1979), for example, employees monitoring oil flow in pipelines notified field personnel when problems arose but, unlike the present case, they had "no further authority or responsibility to direct the field personnel in the manner of performing their remedial duties." In *Oil, Chemical and Atomic Workers Int'l Union v. NLRB*, 445 F.2d 237, 242 (D.C.Cir. 1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972), helium plant operators were specifically instructed to contact the plant manager in any emergency "rather than to exercise 'independent judgment.'" By contrast,

system supervisors in the case at bar are explicitly admonished to take any necessary measures to protect the system in emergencies anytime supervisors are unavailable or time pressures forbid consultation.

In its decision, the Board cites prior NLRB decisions [13] ruling that electrical utility dispatchers (which the Board finds, without discussion, to be "obviously analogous" to system supervisors) were neither supervisory nor managerial personnel. *Arizona Public Service Co.*, 182 N.L.R.B. 505 (1970), *enf. denied* 453 F.2d 228 (9th Cir. 1971), and *West Penn Power Co.*, 139 N.L.R.B. 810 (1962), *enf. denied* 337 F.2d 993 (3d Cir. 1964), however, undermine the Board's conclusion here since enforcement was ultimately denied in both cases. The system supervisors' responsibility actually to direct employees in the field is significantly broader than authority of the dispatchers in *Western Colorado Power Co.*, 190 N.L.R.B. 564, 566 (1971), who could "effect the assignment of other employees only remotely by calling for a line crew at an outlying station in emergency situations." Similarly, this case is unlike *Connecticut Light and Power Co.*, 121 N.L.R.B. 768 (1958), in which the Board denied both supervisory and managerial status to an electrical utility's load dispatchers. On the surface, the dispatchers' responsibilities seem somewhat analogous to many of the duties performed by system supervisors, but the opinion contains too little detail to ascertain the actual amount of authority possessed by the dispatchers. The Board accorded substantial significance to the existence of "detailed written rules" which, it found, abrogated the dispatchers' independence. *Id.* at 770. To the extent that these regulations were so detailed and binding as to prohibit any exercise of independent judgment, *Connecticut Light and Power* differs from the case at bar in a crucial respect. To the extent, however, that the Board may have mischaracterized rules which this and other circuits

---

**13.** While Board decisions merit respectful consideration as authority, we do note that the orders cited by the Board involving electrical utility dispatchers which have been reviewed by the courts have been denied enforcement.

consider mere written guidelines [14] allowing independent discretion, the Board's view clearly is contrary to the law as it exists today. For the same reason, this case is also unlike *Boston Gas. Co.*, 136 N.L.R.B. 219, 223 (1962), in which action taken by dispatchers in emergency situations required some initial discretion, but essentially "involve[d] certain predetermined procedures varying in each case only in a degree corresponding to the extent of the emergency." Finally, in *Baltimore Gas and Electric Co.*, 138 N.L.R.B. 270, 277 (1962), the Board granted supervisory status to chief and senior load dispatchers, but denied that status to the remaining load dispatchers. Chief and senior dispatchers forecasted and scheduled electric loads as do the system supervisors in the case at bar. The Board shed no further light upon dispatchers' responsibilities except to note that the lower level dispatchers worked under the immediate supervision of, or performed their duties according to explicit written directions left by, the senior dispatcher. 138 N.L.R.B. at 277. Consequently, we cannot conclude that the duties of lower level dispatchers and system supervisors are identical, or that the responsibilities of chief or senior dispatchers and system supervisors differ significantly.[15]

For the reasons stated herein, the Company's petition to set aside the Board's order is granted and the Board's cross-application for enforcement is denied.

Petition To Set Aside Granted; Enforcement Denied.

---

14. The courts have rejected the argument that written guidelines preclude independent judgment where the evidence does not show (1) that they cover any situation which might arise, and (2) that employees cannot depart from the guidelines even when they conclude that another course of action would be more appropriate. *Maine Yankee*, 624 F.2d at 362; *Detroit Edison*, 537 F.2d at 243.

15. We find it unnecessary to discuss *Idaho Power Co.*, 126 N.L.R.B. 547, 551–52 (1960), cited by the Board in the instant case, because *Idaho Power* discussed dispatchers only in relation to their alleged managerial status, an issue which we decline to resolve in the context of the present case.